Shaffer C. TIM, Appellant,

v.

AMERICAN PRESIDENT LINES, LTD., a corporation, Appellee.

No. 22395.

United States Court of Appeals Ninth Circuit.

March 18, 1969.

Rehearing Denied April 15, 1969.

---

R. Jay Engel (argued), Hugh B. Miller, of Jarvis, Miller & Stender, San Francisco, Cal., for appellant.

Garrett P. Graham (argued), and Graydon S. Staring of Lillick, McHose, Wheat, Adams & Charles, San Francisco, Cal., for appellee.

Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

Shaffer C. Tim, the appellant, sustained serious personal injuries while employed by American President Lines and acting in the course of his employment as chief electrician aboard the S.S. President Tyler. At the time of the accident cargo at the No. 4 hatch of the ship was being worked by employees of Matson Terminals, Inc., a stevedore company employed by the United States Government to handle the Government's cargo.

The cargo was being unloaded with a gantry crane. A supervisory employee

of Matson Terminals, Inc. complained to Tim that the crane was not operating fast enough. Tim went to the operator's cab and made the necessary adjustments. While there he thought he noticed that an overhead electrical cable had become disengaged from its reel. He told the operator, a longshoreman-employee of Matson Terminals, to stop the crane in order to permit an inspection. He then proceeded to the steel mesh platform outside the cab where a ladder led from the platform to the top of the crane. Above the ladder was a safety screen designed so that a person could not climb to the top of the crane while the crane was in operation. In order to climb the ladder a person had to slide back the safety screen. When the screen was moved back two to three inches the electrical circuit which energized the crane was disconnected. Tim knew that moving the safety screen would render the crane inoperative, but rather than do this he placed his feet on the second step of the ladder and craned his head outside and above the screen. As he did so the crane operator started the crane, causing Tim's head to be caught between the safety screen and a stationary overhead object.

Tim filed this libel against American President Lines in the United States District court for the Northern District of California, seeking damages under the Jones Act (46 U.S.C. § 688) on a claim of negligence and under the general maritime law on a claim of unseaworthiness. The District Court held against Tim. We discuss each claim in turn.

## NEGLIGENCE

■ The District Court found that the American President Lines was not negligent and that the injury was caused by the concurrent negligence of Tim and the gantry crane operator.[1] Tim does not challenge the finding that the American President Lines was not itself negligent. Rather he contends that American President Lines is liable for the negligence of the stevedore's employee— the gantry crane operator. American President Lines is not liable for the negligence of the stevedore's employee unless that employee was an "agent" as that term is used in the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq.[2] The test for agency under the FELA and the Jones Act has been elucidated by Sinkler v. Missouri Pac. R.R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed. 2d 799 (1958) and Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed 2d 740 (1966).

In *Sinkler* the petitioner was employed by the Missouri Pacific Railroad Company. He was injured as a result of the negligence of a switching crew employed by Belt Railway. Missouri Pacific was one of the organizers of Belt Railway and owned half its stock and designated one-half of its directors. The Supreme Court held, 356 U.S. 331–332, 78 S.Ct. 762:

"In the present case the respondent [Missouri Pacific] rather that doing the necessary switching incident to its business in the Houston Terminal area, arranged that the Belt Railway should supply the crews and equipment to perform this operation on its behalf. But the evidence clearly es-

1. Appellant argues that he was not guilty of contributory negligence since he had a right to rely on the stevedore performing his duty with due care. Since we affirm the District Court's judgment we do not reach this question. Similarly, we do not consider the question whether the District Court erred in making a finding on damages once it concluded there was no liability on the part of the defendant.

2. The Jones Act incorporates the Federal Employers' Liability Act:
   "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply * * *." 46 U.S.C. § 688.

tablishes that the respondent's trains, when under the control of the Belt Railway's switching crews, were being handled to further the task of the respondent's enterprise. While engaged in switching and handling respondent's cars and trains about the terminal area, the Belt Railway employees on the job were, for purposes of the FELA, as much a part of the respondent's total enterprise as was the petitioner while engaged in his regular work on the respondent's car.

"It is manifest that the corporate autonomy of the Belt Railway, and its freedom from detailed supervision of its operations by respondent, are irrelevant inasmuch as the switching crew of the Belt Railway Company at the moment of the collision in the station was engaged in furthering the operational activities of respondent. We therefore hold that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA."

In *Hopson*, two seamen became ill in Trinidad and were unable to continue the voyage. In order to comply with the statutory requirement that incapacitated seamen be brought before a United States Consul before discharge in a foreign port the ship's Master procured a cab for the trip. En route a collision occurred as a result of the negligence of the taxi driver, killing one seaman and seriously injuring the other. The Supreme Court emphasized at 383 U.S. 264, 86 S.Ct. 766:

"Getting these two ill seamen to the United States Consul's Office was, therefore, the duty of respondent. And it was respondent—not the seaman—which selected, as it had done many times before, the taxi service. Respondent—the law says—should bear the responsibility for the negligence of the driver which it chose."

■ The facts, as found by the District Court in the present case, are not contested:

"Respondent American President Lines did not select Matson Terminals, Inc. to load or unload the cargo aboard the SS PRESIDENT TYLER on February 2, 1965, had no oral or written contract with Matson Terminals, Inc. to do so and was not shown to have any ownership or other financial interest in Matson Terminals, Inc."

Applying the test of *Sinkler* and *Hopson* to these facts, we agree with the District Court that Matson Terminals, Inc. was not the agent of American President Lines.

## UNSEAWORTHINESS

■ A shipowner is required to furnish a seaworthy vessel. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). This duty is absolute [Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960)] and continuing. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). But the ship owner is not an insurer against every injury that may occur in connection with the ship.

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."

Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). See also Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962).

■ In the present case the District Court found that the vessel and her appurtenances were reasonably fit for their intended use, that they were sea-

worthy, that both Tim and the operator were negligent, and that their negligence concurred as the sole proximate causes of the accident. Tim does not contend that the vessel or her appurtenances were inherently defective. Rather, he contends that the vessel was rendered unseaworthy by reason of negligence of the gantry crane operator at the very moment of the injury. A long line of cases in this Circuit has consistently rejected any doctrine of "instant unseaworthiness." We have held that liability attaches if an act leaves the vessel in an unsafe condition subsequently resulting in injury but does not if the act and resulting injury are simultaneous. Alaska S.S. Co. v. Garcia, 378 F.2d 153, 155 (9th Cir. 1967); Huff v. Matson Navigation Co., 338 F.2d 205, 216 n. 14 (9th Cir. 1964), cert. denied, 380 U.S. 943, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965); Beeler v. Alaska Aggregate Corp., 336 F.2d 108 (9th Cir. 1964), cert. denied, 379 U.S. 1000, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965); Billeci v. United States, 298 F.2d 703 (9th Cir. 1962); Rawson v. Calmar S.S. Corp., 304 F.2d 202, 205 (9th Cir. 1962); Titus v. The Santorini, 258 F.2d 352 (9th Cir. 1958).[3] Cf. Blassingill v. Waterman S.S. Corp., 336 F.2d 367 (9th Cir. 1964). The District Court's finding must be affirmed on the basis of these cases unless, as urged by Tim, they have been recently overruled by implication by the Supreme Court in Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967) or Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967).

■ *Waldron* provides Tim no support. There the court stated: "The single legal question presented by this case is whether a vessel is unseaworthy when its officers assign too few crewmen to perform a particular task in a safe and prudent manner." 386 U.S. at 724, 87 S.Ct. at 1410. In answering this question in the affirmative the Court had no occasion to and did not consider whether a longshoreman's negligence in itself constituted unseaworthiness.

And we regard *Mascuilli* as inapposite. That case was one to recover damages for the death of a longshoreman who was killed during a loading operation when fellow members of the stevedoring crew negligently allowed one of three interconnected cables to be wound in by its winch faster than the other two were payed out by their respective winches. The resulting tightline condition caused a shackle to spread and the cable to strike and mortally injure Mascuilli. The District Court denied recovery. It noted that the circuit breakers on the winches were set in excess of the rated pull of the winches, but expressly held that this fact had no bearing on the case. Rather, the District Court in finding No. 35 found that the vessel and its equipment was in seaworthy condition at all times and that the accident was caused solely by the negligence of the stevedoring crew. Mascuilli v. United States, 241 F.Supp. 354, 362 (E.D.Pa.1965).

The Third Circuit affirmed, holding that the District Court's finding No. 35 was not clearly erroneous. 358 F.2d 133 (3d Cir. 1966). The Supreme Court, citing Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944) and Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), granted certiorari and summarily reversed. Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967).

3. For discussions of instantaneous unseaworthiness, operational negligence, and the act-condition dichotomy, see generally The Doctrine of Unseaworthiness in the Lower Federal Courts, 76 Harv.L.Rev. 819, 827–28 (1963); The Law of Unseaworthiness and the Doctrine of Instant Unseaworthiness, 28 Md.L.Rev. 249, 264–91 (1968); Note Unseaworthiness, Operational Negligence, and the Death of the Longshoremen's and Harbor Workers' Compensation Act, 43 Notre Dame Lawyer 550, 557–65 (1968); The Doctrine of Unseaworthiness: Developing Restriction of the Act-Condition Dichotomy, 21 Rutgers L.Rev. 322 (1967); 14 Loyola L.Rev. 174 (1967–68); 42 Tulane L.Rev. 648 (1968); 113 U.Pa.L.Rev. 614 (1965).

This decision has created considerable uncertainty in the lower Federal Courts as to whether or not operational negligence constitutes unseaworthiness.[4] The Second Circuit, in Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961 (2d Cir. 1967), relying upon United States Law Week, apparently concluded that the sole question before the Supreme Court in *Mascuilli* was: "Does dangerous condition caused by stevedore's negligent handling of proper equipment render vessel unseaworthy and its owner liable for resulting injuries?" 382 F.2d at 962, quoting 35 U.S.L.W. 3052 (U.S. July 26, 1966). Noting that the District Court in *Mascuilli* had found that the accident had occurred "instantaneously," the Second Circuit concluded that the Supreme Court had attributed "unseaworthiness to a vessel which is in every respect soundly constructed and completely equipped merely because of the negligence of longshoremen or crew members engaged in an operation on board * * *." 382 F.2d at 962.[5] And

the Fourth Circuit in Venable v. A/S Det Forenede Dampskibsselskab, 399 F. 2d 347 (4th Cir. 1968), using similar reasoning and relying upon *Candiano*, concluded "that *Mascuilli* must be read as rejecting operational negligence 'as a factor in the determination of liability.'" 399 F.2d at 351.[6]

However, we do not believe this to be the meaning of *Mascuilli*. In the petition for certiorari, Mascuilli did not state that there was simply one question presented for review but rather asserted that there were three:

"1. Where the safety devices on a ship's loading gear are set at one and a half and three times in excess of the safe working load of the ship's gear and fail to arrest the electric current when the strain exceeded the safe working load of the gear, was the vessel not unseaworthy and the owner liable for the death of a longshoreman resulting from the fractured gear under the principle of law enunciated by

---

4. Compare Sandoval v. Mitsui Sempaku K.K. Tokyo, 288 F.Supp. 377, 382 (D. Canal Zone 1968), Hanks v. California Co., 280 F.Supp. 730, 739 (W.D.La.1967), and Jackson v. The S.S. Kings Point, 276 F.Supp. 451, 452 (E.D.La.1967), with Wilson v. Societa Italiana de Armamento, 279 F.Supp. 945, 948 (E.D.La.1968) and Venable v. A/S Det Forenede Dampskibsselskab, 275 F.Supp. 591, 597 (E.D. Va.1967), rev'd 399 F.2d 347 (4th Cir. 1968). See The Law of Unseaworthiness and the Doctrine of Instant Unseaworthiness, 28 Md.L.Rev. 249 (1968); Note, Unseaworthiness, Operational Negligence, and the Death of the Longshoremen's and Harbor Workers' Compensation Act, 43 Notre Dame Lawyer 550 (1968); 14 Loyola L.Rev. 174 (1967–68); 42 Tulane L.Rev. 648 (1968).

5. The authority of *Candiano's* interpretation of *Mascuilli* is cast in doubt by Judge Moore's concurring opinon on the petition for rehearing. Candiano v. Moore-McCormack Lines, Inc., 386 F.2d 444 (2d Cir. 1967). Judge Moore (who wrote the original opinion in *Candiano*) points out that since *Mascuilli* was undecided at the time of oral argument petitioner had no opportunity to present its views as to the effect, if any, of *Mascuilli* upon *Candiano*. *Id*. at 444. He further agrees that "*Mas-*

*cuilli* may be explained on the basis of *Crumady*, namely, that the safety circuit breaker was improperly set so that the controller did not trip and thus cut off the power." *Id*. at 449. He nevertheless agrees that the petition for rehearing should be denied, apparently because the "intervening cases would only strengthen the conclusion that the negligent hook-up followed by 'an appreciable period of time' (as found by the trial court) would create an unseaworthy condition." *Id*. at 449.

6. The Fourth Circuit's interpretation of *Mascuilli* is rendered less than clear as a result of the opinion on the petition for rehearing en banc in Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 355–356 (4th Cir. 1968):

"Appellee's Petition misconceives this court's holding. We adhere to the view that operational negligence may cause unseaworthiness, but do not intimate that every instance of operational negligence necessarily creates liability under the unseaworthiness doctrine. The defect in the charge of the District Court, which required reversal, is that it ruled out the possibility of a finding that the manner in which the longshoremen performed their duties resulted in an unseaworthy condition."

this Court in Crumady v. 'Joachim Hendrik Fisser,' 358 U.S. 423 [79 S. Ct. 445, 3 L.Ed.2d 413] (1959), wherein this Court held that where a dangerous condition due to the excess setting of the ship's safety devices is brought into play by the negligent operation of the stevedores, the resulting injuries must be deemed due to the unseaworthiness of the vessel?

"2. Did the Court below err in failing to follow the principle of law enunciated by the Second Circuit, the Fourth Circuit, and the Ninth Circuit, holding that a dangerous condition caused by the stevedore's negligent handling of proper equipment renders the vessel unseaworthy and its owner liable for resulting injuries?

"3. Where the longshoremen charged with creating the unseaworthy condition aboard the vessel are found by the trial court to be 'not equal in disposition and seamanship to the ordinary men in the calling', should not the vessel have been held to be unseaworthy and the shipowner liable for the death resulting from that condition, under the decision of this Court in Boudoin v. Lykes Bros. [S.S. Co.], 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354] (1955)."

Petitioner's Brief for Certiorari at 2, Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967) (footnotes omitted).

Our examination and study of Mascuilli's brief in the Supreme Court and the Crumady and Mahnich cases cited by the Supreme Court in its decision

lead us to conclude that the reversal was predicated upon the Court's answer to the first of the above three questions. Petitioner's principal attention was devoted to that question. She vigorously argued that the vessel was unseaworthy as a result of a dangerous condition in that the circuit breakers on the winches were set in excess of the safe working load of the gear. Only in connection with this argument did petitioner cite both Crumady and Mahnich. For this argument Crumady in particular was relied upon; the petitioner argued that the case at bar was "in flat conflict with Crumady." Petitioner's Brief for Certiorari at 8, Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967).

And the Supreme Court's citation of Crumady and Mahnich is most readily explicable on the premise that the Court accepted petitioner's first argument.[7] In both those cases the unseaworthiness rested upon an existing condition which was brought into play by a subsequent negligent act. Thus, in Mahnich a seaman was injured by a fall from a staging which gave way when a piece of defective rope supporting it parted. The defective rope had been supplied by the mate when there was ample sound rope available for use in rigging the staging. And in Crumady, the circuit breakers on the winches had been set at twice the safe working load. Negligent operation by the stevedores brought this unseaworthy condition into play by creating a stress on the topping-lift greatly in excess of its safe working load.

7. The Fourth Circuit has sought to explain the Court's citation of Mahnich and Crumady as emphasis of the Supreme Court's deep concern for the welfare of seamen and longshoremen. Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 351 (4th Cir. 1968). We do not find this explanation convincing. Deep concern for the welfare of seamen and longshoremen, taken by itself, is not a legal rule that can explain why a particular judgment is reversed. Furthermore, if the Supreme Court had wanted to emphasize its deep concern for seamen

and longshoremen, it could have cited Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 726, 87 S.Ct. 1410, 1411, 18 L.Ed.2d 482 (1967), which stressed "the broad remedial purposes of the doctrine of unseaworthiness," rather than Crumady, which does not mention any such deep concern, and Mahnich, which mentions in passing "the conditions of the seaman's employment * * * which have been deemed to make him a ward of the admiralty and to place large responsibility for his safety on the owner." 321 U.S. at 103, 64 S.Ct. at 459.

The facts of *Mascuilli* (as urged by the petitioner) fit squarely within the principle of those cases, that is, an improper setting of circuit breakers brought into play by negligence of the longshoremen. And in addition, in this version the facts in *Mascuilli* are remarkably similar to those in *Crumady*. In sum we believe it fair to conclude that the Court reversed *Mascuilli* because of the asserted factual similarity with *Crumady* and did not reach the question of instantaneous unseaworthiness.[8]

The judgment is affirmed.

---

8. Law review commentary is in accordance with this interpretation of *Mascuilli*. See the Law of Unseaworthiness and the Doctrine of Instant Unseaworthiness, 28 Md.L.Rev. 249, 290 (1968); Note, Unseaworthiness, Operational Negligence, and the Death of the Longshoremen's and Harbor Workers' Compensation Act, 43 Notre Dame Lawyer 550, 563–64 (1968); 14 Loyola L.Rev. 174, 185–87 (1967–68); 42 Tulane L.Rev. 648, 651–52 (1968).