Judith Barbara WILLIAMSON, Administratrix of the Estate of Joel Dwaine Williamson, Deceased, Plaintiff,

v.

WESTERN–PACIFIC DREDGING CORPORATION, an Oregon corporation, Defendant.

WESTERN–PACIFIC DREDGING CORPORATION, an Oregon corporation, Third-Party Plaintiff,

v.

Don L. FERGUSON and Portland Seattle Freight Lines, a California corporation, Third-Party Defendants.

Civ. No. 68–174.

United States District Court
D. Oregon.

Aug. 19, 1969.

Walter H. Evans, Jr., and William D. Peek, Portland, Or., for plaintiff.

Lloyd W. Weisensee, Gray, Fredrickson & Heath, Portland, Or., for defendant Western Pacific.

John Gordon Gearin, Portland, Or., for third-party defendant Ferguson.

Duane Vergeer, Vergeer, Samuels, Roehr & Sweek, Portland, Or., for third-party defendant Portland Seattle Freight Lines.

## FINDINGS AND OPINION

KILKENNY, District Judge:

This action grows out of an automobile accident between a vehicle driven by third party defendant Ferguson and a truck operated by Portland Seattle Freight Lines. Two counts are involved, (1) maintenance and cure, and (2) damages for wrongful death under the Jones Act.

The accident occurred on December 21, 1967, in Clark County, Washington. Western-Pacific denies liability for maintenance and cure and for damages under the Jones Act and affirmatively alleges that if the accident arose out of and in the course of decedent's employment, that plaintiff's sole remedy is under the Workmen's Compensation Law of the State of Oregon under its extra-territorial coverage.

Western-Pacific, with leave of Court, joined as third party defendants in admiralty, the driver, Ferguson, and the truck line, Portland Seattle Freight Lines. It claims indemnity against each. Third party defendants deny all liability to plaintiff and to Western-Pacific.

Plaintiff is the administratrix of the estate of Joel Dwaine Williamson and has been authorized by the Circuit Court of the State of Oregon to prosecute this action. Defendant Western-Pacific is an Oregon corporation, with its principal place of business in Portland, Oregon, and is the owner and operator of a dredge named H. W. McCURDY.

The dredge is a vessel 144 feet in length with a beam of 43 feet. It has a

gross and net tonnage of 535 tons and is capable of limited movement, by manipulating its spuds and anchors, but is not self-propelled in the usual sense of the word. When the dredge is in use, it customarily operates with the assistance of one or more smaller tugs or tenders, which are self-propelled vessels.

On the indicated date, and for some time prior thereto, the dredge was being operated by Western-Pacific in the performance of a contract with the United States Department of the Army in connection with dredging the Columbia River for the purpose of maintaining and improving the channel for use in navigation and commerce.

For more than two years before the accident, decedent had been employed by Western-Pacific on said dredge, initially as a deck hand and at and prior to the time of the accident as a mate. His duties consisted of assisting in the operation of the dredge and the maintenance thereof and assisting in the navigation and operation of the tender vessels and, when the dredge was being moved, assisting in its navigation. At the time of the accident, the dredge was operating in the Columbia River near Woodland, Washington. It was then operating three shifts of eight hours each per day. The practice of Western-Pacific was to rotate the shifts of its employees, other than employees engaged primarily in maintenance and repair, in such a manner that its employees would work one week on the day, the next week on the swing, and the next week on the graveyard shift.

As construction projects for the improvement of the channel of the Columbia became available, Western-Pacific would bid upon the same and if it received a contract, would move the dredge to the site at places up and down the Columbia River between Astoria and Hood River, Oregon. Likewise, Western-Pacific would designate various points on shore to which its employees should report and at which points its employees would be picked up and discharged by launch at the beginning and end of each shift. Each of the employees, by virtue of a union contract under which each was employed, was entitled to and was paid "travel pay" by Western-Pacific. The amount of the "travel pay" depended on the distance between the project and the city hall in certain designated cities. At the time of the accident, decedent, and its other employees subject to the contract, were receiving $4.00 per day as "travel pay". On the mentioned day, decedent was employed as a mate, Don Ferguson as a deck hand and Edward Roberts as a lever man. In the week beginning December 18, 1967, and ending December 24, 1967, each was employed on the day shift. During that period, decedent and Ferguson adopted the practice of riding, in the same automobile, from the Interstate Bridge at Vancouver to work, each of the individuals driving one day and riding the following. Prior to the accident, the vehicle of Roberts had become unreliable. He then made or was making arrangements to acquire a newer vehicle and, for the period immediately before the date of the accident, the decedent and Don Ferguson had been driving alternate days. Roberts intended to drive continuously, after he had obtained his new car, for a sufficient number of days to equalize the expense and time involved in furnishing and operating an automobile to and from the location of the dredge. Roberts then lived in Vancouver, Washington, Ferguson in Portland and decedent in Clackamas, Oregon. Decedent and Ferguson customarily met in a parking lot at the Safeway Store, Jantzen Beach, at the Oregon end of the Interstate Bridge. From there they drove across the bridge to Vancouver, picked up Roberts and the three would proceed to work. At the termination of the shift, the three would proceed by car to the freeway exit in Vancouver, leave Roberts, and drive to the Jantzen Beach parking lot where Ferguson and decedent would separate. The hours of the shifts being worked by the men were from 7:30 A.M. to 3:30 P.M. on the day, 3:30 P.M. to 11:30 P.M. on the swing and 11:30 P.M. to 7:30 A.M. on the graveyard shift.

Each of the three employees, at times, were subject to being required to work extra hours past the end of their regular shift to replace a member of the succeeding shift who did not report for work, and then work either a half or a whole shift until a replacement for the absent member could be arranged. At the time of the accident, Leroy Nielsen was superintendent of Western-Pacific's operations in connection with the dredge. He was the top ranking employee of Western-Pacific who customarily visited and was in charge of the operation of the dredge and its crew.

On the fatal day, about 7:00 A.M., Ferguson's vehicle was being operated by him, with decedent in the right front seat and Roberts in the rear. Some 15 miles north of Vancouver on Interstate Highway No. 5, on the way to work, the vehicle collided with a truck and tractor combination owned and operated by third party defendant Portland Seattle Freight Lines. It is admitted that the impact occurred on the westerly or southbound portion of said highway. The exact cause of the accident and any negligence in connection therewith is in dispute between the parties. Decedent received serious injuries in said accident. He died the same day at a Vancouver hospital. His death was a proximate result of the injuries he had received in said accident.

Argonaut Insurance Company, hereinafter referred to as "Argonaut", was and is a California corporation, engaged in the business of writing casualty and liability insurance and qualified to do so in the State of Oregon. On December 21, 1967, Western-Pacific was the named insured in certain policies of insurance issued by Argonaut wherein and whereby Argonaut insured defendant within certain limits against any liability of defendant for maintenance and cure, and any liability of defendant under the Jones Act.

On said date, Western-Pacific was subject to the provisions of the Workmen's Compensation Law of the State of Oregon as a subject employer, and had provided coverage under said Workmen's Compensation Law by becoming a direct responsibility employer by filing with the Workmen's Compensation Board of the State of Oregon a contract issued by Argonaut, in which Argonaut agreed to assume without monetary limit the liability of Western-Pacific for compensation for injuries occurring to subject workmen.

Plaintiff incurred medical, hospital, x-ray and ambulance expense in the reasonable sum of $920.65, and funeral and burial expense in the reasonable sum of $1,800.00.

From the Bench, at the close of the trial, I held that the defendant, Don L. Ferguson, the driver of the vehicle in which plaintiff's intestate was riding, was negligent in the following particulars:

(a) In driving at a speed that was greater than was reasonable and prudent under the circumstances then and there existing, to-wit: the impaired visibility, slippery surface due to ice and snow, and the curve in the highway, to-wit: in excess of 35 miles per hour,

(b) In attempting to pass a vehicle while proceeding around a left-hand curve when defendant knew or should have known of the hazard involved by reason of the possibility of ice and snow upon said highway, and the increased danger of skidding while accelerating or braking,

(c) In failing to keep said vehicle under proper control,

(d) In failing to keep a lookout for slick surfaces upon the highway,

(e) In failing to keep his vehicle on the right-hand half of said highway,

(f) In failing to have his vehicle equipped with chains or snow tires.

Moreover, I held that each of said acts of negligence was a proximate cause of decedent's injuries and resulting death.

Prior to trial, I segregated the issues between the third party plaintiff and the third party defendants, with the understanding that all relevant and material evidence introduced in the main trial

could be employed in deciding the issues between the third parties. Here, I might state that I can find no evidence of negligence on the part of third party defendant Portland Seattle Freight Lines and its motion to dismiss is allowed.

## COMPENSATION ACTS

The effect of the Oregon Workmen's Compensation Act, although touched on in the briefs, is not seriously urged as a defense. We are here concerned with legislation enacted by the National Congress. Conceding, as I must, that a "twilight" zone may exist in which a seaman may elect to pursue a state-oriented remedy, such as one under a State Workmen's Compensation Act, or a State Employer's Liability Act, or may press his Federal claim, if any, under the Longshoremen and Harbor Workers' Act, Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962), I am of the view that the benefits of the Oregon Workmen's Compensation Act [1] are not available to an injured workman, or his beneficiaries, if the workman is a seaman. Such a person is expressly purged from the Oregon Act by ORS 656.027, subsection (4), which excludes "(4) [a] person for whom a rule of liability for injury or death arising out of and in the course of the employment is provided by the laws of the United States. * * * *", Cassil v. United States Emergency Fleet Corp., 9 Cir., 289 F. 774 (1923); Martinson v. SIAC, 154 Or. 423, 60 P.2d 972 (1936), cert. denied 300 U.S. 659, 57 S. Ct. 435, 81 L.Ed. 868. Also in point is Calbeck v. Travelers Ins. Co., *supra.*

Moreover, the Longshoremen and Harbor Workers' Act applies only to injuries occurring on navigable waters and excludes from coverage a member of the *crew* of a vessel. 33 U.S.C. § 903(a) (1). Already, I have found that decedent was a member of the crew of the MC CURDY.

Of more than passing interest is the fact that plaintiff gave notice of the accident to Argonaut, the defendant's compensation carrier. Argonaut rejected the claim.

## MAINTENANCE AND CURE

Defendant's challenge goes to the merits of this claim. A resolution of this issue necessarily involves the admiralty jurisdiction of the Court. To recover, plaintiff must establish that her husband, at the time of the fatal injury, was a seaman acting within the service of his ship. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). Here, there is no claim that decedent was guilty of culpable misconduct. Nor, on the record, is there any basis for such a claim.

Although defendant appears to concede that decedent was a seaman at the time of injury, nevertheless, a thorough discussion of his status is warranted. Beyond question, the MC CURDY was a vessel in navigable waters. City of Los Angeles v. United Dredging Co., 14 F.2d 364 (9th Cir. 1926). Moreover, aside from defendant's apparent concession, I find that decedent was a "seaman" member of the MC CURDY'S crew. Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957); Lawrence v. Norfolk Dredging Co., 319 F.2d 805 (4th Cir. 1963); Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430 (1944).

Left for discussion and decision is the issue of whether Williamson was acting in the service of his ship at the time of his fatal injury, so as to entitle plaintiff to maintenance and cure.

*Aguilar* teaches that maintenance and cure may be awarded to a seaman for injury incurred while the seaman is ashore and on his own business. There, the seaman was injured while crossing a dock on returning to his ship from shore leave. This was the only available route between the ship and the public street. In Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949), the seaman overstayed his shore

1. ORS 656.126, subsection (1).

leave and on returning to the ship, in rain and darkness, became lost and attempted to enter the shore-front area about a mile from where the ship lay moored. The general area was blacked out. In a partially lighted area, the claimant fell over a guard chain into a drydock, sustaining serious injuries. The Government did not challenge the allowance of maintenance and cure during his hospitalization, but did challenge his maintenance for life. Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L. Ed. 503 (1951), extends the doctrine to a seaman, on shore leave, who was injured in a dance hall, some distance from the waterfront.

True enough, the seamen in *Aguilar*, *Farrell* and *Warren* were more or less permanently based aboard ship. *Aguilar* mentions that such men could not "live for long cooped up aboard ship without substantial impairment of their efficiency." Defendant attempts to make a distinction between these cases and one, such as here, where decedent commuted to his home each day after completing his work shift. It argues that decedent was the same as any shoreside worker. Inasmuch as decedent was less confined to the ship, says the defendant, his time spent away from the vessel, unlike the shore leave considered essential for a "cooped up" seaman, *Aguilar, supra,* should not here be considered to be in the service of the ship.

■ The framework of this rather misty distinction is destroyed by the well reasoned opinion in Weiss v. Central Ry. Co. of New Jersey, 235 F.2d 309 (2d Cir. 1956). There, the Court refused to deny a seaman his right to maintenance and cure because he did not live the life traditionally tailored to a seaman. In principle, the Court there held that a seaman was entitled to the traditional privileges of his status, even though he slept ashore at night. To hold otherwise, said the Court, would be to create a "genre of 'seamen' ineligible for the benefits of maintenance and cure, yet equally barred from recovery under the Longshoremens Act, 33 U.S.C. § 903(a) (1)." 235 F.2d at 313. Hudspeth v. Atlantic & Gulf Stevedores, Inc., 266 F. Supp. 937 (E.D.La.1967) is in full support of *Weiss*.[2]

■ In order to be in the service or the ship and entitled to recover, plaintiff must show that the decedent was "generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders." *Farrell, supra*, 336 U.S. at 516, 69 S.Ct. at 709. It is clear that decedent was as much answerable to the call to duty at the time of his injury as other seamen in the shore leave cases. Defendant elected not to provide sleeping quarters on board the MC CURDY, and in lieu required its "seamen" to go home for each sleeping period. By making travel allowances, under these circumstances, decedent was, in effect, granted a daily "shore leave" just as a "blue water" seaman might have been granted shore leave while in port. In returning to the ship by automobile, at the time of the accident, he was better serving the ship than were some of the seamen in other shore leave cases.

■ Granting that the employment of the doctrine of maintenance and cure on these facts would be going somewhat outside the perimeter of established case law, nevertheless, I must recognize the flexibility of the ever expanding field of admiralty to meet the standards and requirements of an ever advancing age of civilization. Admiralty has been the guardian and protector of the seaman for many centuries. Its already lengthy arms will continue to grow, reach out and protect its seaman wards. The granting of maintenance and cure in this case will not, as argued by defendant, create a doctrine of absolute liability by negating the requirement of "service of the ship". I here hold and find that decedent was in the service of the ship at

---

2. Neither *Weiss* nor *Hudspeth* considered an injury as far removed, in terms of the locus of the accident, as here presented.

the time of his injuries. For that matter, the doctrine of absolute liability for maintenance and cure may already be established. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); Gilmore & Black Admiralty, 261 (1957). Of course, this case is factually distinguishable from a case where a seaman is injured in his home. Palmer v. Boat Edith L. Boudreau, Inc., 352 Mass. 179, 223 N.E.2d 919 (1967).

■ It is my considered judgment that to deny plaintiff a recovery for maintenance and cure would be "out of harmony with the spirit and function of the doctrine" and would run counter to the remedy's basic merit. Even in cases of doubt, the issue should be resolved in favor of the seaman. *Aguilar, supra.*

Plaintiff is entitled to prevail on the issue of maintenance and cure.

## JONES ACT

■ Under this Act, plaintiff must prove that the decedent was a seaman, who was acting in the course of his employment at the time of the injury, and that the injury was caused by the fault of, or attributable to, his employer. Braen v. Pfeifer Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959).

The Jones Act [3] confers upon a seaman "who shall suffer personal injury in the *course of his employment*" the rights of action for personal injury and death available to railway employees under 45 U.S.C. § 51, the Federal Employers' Liability Act, commonly known as FELA. The latter creates a cause of action in employees who *incur* " * * * injury or death resulting in whole or in part from the negligence of* any of the officers, agents, or *employees* of such carrier * * *." Already, I have found that Williamson was a seaman and was in the course of his employment at the time of the occurrence. As to Ferguson, there is no sound reason to depart from my Williamson finding. However, liability for maintenance and cure is sometimes far afield from liability under the Jones Act. This difference makes imperative a discussion of the Jones Act, measured by FELA, as applied to these facts. To recover, plaintiff must show that Ferguson was in the "course of his employment" as that phrase is used in the Act, and that Ferguson was an officer, agent or employee, whose negligence, in whole or in part, contributed to the injury and resulting death of decedent.

In major part, plaintiff relies on the following facts: (1) that defendant was obligated, under the Union contract, to pay, and did pay, decedent and Ferguson each a travel allowance; (2) that defendant announced a policy, or directive, to its employees that they were not all to come to work in one car, this to indicate that defendant had exercised a right of control over the transportation method which employees might use to reach a particular job site; and (3) that on occasion defendant would ask various members of the MC CURDY'S crew to work longer hours and receive overtime when a worker on the following shift did not report. Although one of defendant's witnesses testified that an order was issued requiring each worker to use his own automobile in going to work, the fact remains that the order, if any, was not enforced. It is clear that Williamson, Roberts and Ferguson had been regularly riding together in one automobile, that defendant had knowledge of this fact and made no objection thereto. If, in fact, such an order was issued, it would be some evidence of an exercise of control by the defendant, over its employees' method of transportation.

Although Magnolia Towing Co. v. Pace, 378 F.2d 12 (5th Cir. 1967) and Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966), point in plaintiff's direction, each is clearly distinguishable from the facts before me. Evidence in each of those cases clearly indicated an actual control over the seaman's method of travel.

3. 46 U.S.C. § 688.

Other cases cited by plaintiff, such as Marceau v. Great Lakes Transit Corp., 146 F.2d 416 (2d Cir. 1945); Mc-Donough v. Buckeye S.S. Co., 103 F. Supp. 473 (N.D.Ohio 1951); and Kyri-akos v. Goulandris, 151 F.2d 132 (2d Cir. 1945), the latter a maintenance and cure case, are less in point than *Hopson* and *Magnolia*. However, these cases lend support to the legal premise that the place of injury alone does not determine if an accident occurs "in the course of employment." So does O'Donnell v. Great Lakes Dredge & Dock Co., 318 U. S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943).

Plaintiff moves to solid ground when she equates decedent's status under the claim for maintenance and cure with that of decedent's status under the Jones Act. She argues that to hold Williamson was "in the service of the ship" and thus entitled to maintenance and cure, but was not "in the course of employment", and thus not entitled to recovery under the Jones Act, is completely inconsistent. I agree. I find that Ferguson occupied the same status as Williamson. For that matter, it might be said that Ferguson's relationship, in his capacity, as driver, was more concrete than that of Williamson. This view is supported by Braen v. Pfeifer Transportation Co., *supra,* where, in speaking of *Aguilar* and *Warren, supra,* it is said, "They also supply relevant guides to the meaning of the term 'course of employment' under the Act since it is the equivalent of the 'service of the ship' formula used in maintenance and cure cases." 361 U.S. at 132, 133, 80 S.Ct. at 250. The respected authority, Gilmore & Black, The Law of Admiralty, p. 284, speaks on the subject, thusly: "This phrase has taken on, in the Jones Act context, a somewhat broader meaning than it has in Workmen's Compensation Acts. It may be read as equivalent to the 'in the service of the ship' formula used in the maintenance and cure cases. So long as the seaman is injured while 'answerable to the call of duty', whether he is actually on duty or not, he is within the coverage of the Act."

Even in Workmen's Compensation cases, the decedent and Ferguson would be viewed as in the course of their employment at the time the accident occurred. In Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947), the Supreme Court in speaking of a travel allowance, in lieu of furnishing transportation, held that where there was the obligation, it was entirely irrelevant "whether the employer performs the obligation by supplying its own vehicle, hiring the vehicle of an independent contractor, making arrangements with a common carrier, *reimbursing employees for the use of their own vehicles,* or reimbursing employees for the cost of transportation by any means they desire to use." 330 U.S. at 482, 483, 67 S.Ct. at 809 (Emphasis supplied.) To the same effect is United States Fidelity & Guaranty Co. v. Donovan, 94 U.S.App. D.C. 377, 221 F.2d 515 (1954).

Defendant's reliance on Westinghouse Elec. Corp. Elevator Construction Division v. Industrial Accident Comm., 239 Cal.App.2d 533, 48 Cal.Rptr. 758 (1966), is completely misplaced. *Westinghouse* was disapproved by the California Supreme Court in Zenith National Ins. Co. v. Workmen's Compensation Appeals Board, 66 Cal.2d 944, 59 Cal.Rptr. 622, 428 P.2d 606 (1967). There, the Court held that when an employer makes a substantial payment for travel expense in order to induce an employee to accept work at a considerable distance from his home, the employer impliedly agrees that the employment relationship shall continue during the period of "going and coming". The Oregon Court, while not going as far as the California Court in *Zenith,* is susceptible to the same view. Livingston v. State Industrial Accident Comm., 200 Or. 468, 266 P.2d 684 (1954).

Ebasco Services, Inc. v. Bajbek, 79 Ariz. 89, 284 P.2d 459 (1955) is of little, if any, value to defendant. There, on facts similar to ours, the Arizona court held that while an agreement to extend the employer-employee relationship to cover time going and coming to the place of employment, might be implied from

circumstances, it could not be implied where both the company and the union acknowledged an understanding to the contrary. In that case, defendant and the union, in joint conference, construed the travel pay provision of the contract as merely meeting out-of-pocket expenses and not as extending the employer's liability. Defendant's attempt to come within the rule of *Ebasco* was nullified by the failure of "Red" Wages, a former union official, to measure up as a credible witness. Simply stated, his testimony was such that I can give it no weight.

I find that Williamson and Ferguson were each "in the course of his employment" at the crucial moment.

The issue on whether Ferguson was acting within the course of his employment is necessarily entwined with the issue on whether decedent's injury, and resulting death, was due "in whole or in part from the negligence of any of the officers, agents, or employees of * * * " the defendant. Although Ferguson was not an officer of defendant and his agency might be subject to question, there can be little doubt but that he was an employee of the defendant. Fundamental law would prevent recovery by plaintiff unless Ferguson, even though an employee, was acting in the course of his employment. I have already passed on that subject. Ferguson was acting within the perimeter of that restricted legal area. Foster v. Massey, 407 F.2d 343 (D.C.Cir. 1968) is of some assistance. There, the plaintiff was injured in his own automobile while driving to work and made a claim for Workmen's Compensation. Denying compensation on the facts there presented, Judge Prettyman summarized the applicable law in these words: "Usually the trip between home and work lacks all the characteristics of employment (time, place, pay, and employer control), *but if there is pay* for the trip, this thin link is deemed sufficient to bring the trip within the boundary of employment and thus of accident compensability. But obviously, in order to constitute such a link, the identification of pay with trip must be specific and certain. It is not enough that before the trip begins workers are on call rather than on fixed schedules, or to argue in the abstract that the overall compensation takes account, as a background fact, of the inconvenience of being on call rather than being on a fixed schedule." 407 F.2d at 345, 346. Here, the identification of pay with trip is specific and certain. The *Braen, Aguilar* and *Warren* cases, *supra,* lend stout support to the Prettyman statement. Although a finding for plaintiff on this record is invading virgin territory, yet untouched by judicial decision, the courts must recognize the monumental march of our present civilization, particularly in the transportation sphere. Inasmuch as defendant found it to its advantage to pay to its employees a fixed transportation fee, rather than provide quarters aboard the ship, it cannot now escape liability by claiming that decedent and Ferguson were not employees in the course of their employment. With modern highways and ultra-modern and fool proof motor vehicles, the defendant had a "fielder's choice"; it could provide quarters aboard ship for decedent and Ferguson, or it could pay the costs of transportation to and from work. Under the union contract, it elected to do the latter. Not to be forgotten is the oft-stated dogma that the Jones Act created new rights in seamen arising out of maritime torts and must be given a liberal construction in order to accomplish its beneficent purposes. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949). On all of the facts under the law, as I interpret it, I find and conclude that plaintiff is entitled to recover.

The recent case of Tim v. American President Lines, Ltd., 409 F.2d 385 (9th Cir. 1969), is cited by defendant. I fail to find a similarity between the facts in *Tim* and the facts before me. In *Tim,* the Court found that Matson Terminal was not the agent or employee of defendant, had no oral or written contract with the alleged agent, nor did it have any

ownership or financial interest in the alleged agent. *Tim* does not provide an escape hatch for defendant.

## DAMAGES

Decedent, at the time of his death, was 25 years of age. His wife was the same age. His two sons were aged 1 and 2 years respectively. Decedent had a life expectancy of approximately 44 years, and a working life expectancy of approximately 39 years. During the first 11 and two-thirds months of the year 1967, deceased had a gross income of $14,970.63. Had he worked the full year, he would have earned approximately $15,300.00. In 1966, his total wages were $15,906.00. In 1965, $9,284.61. He was a devoted father and husband, and was well thought of by his fellow employees and employer. His supervisor testified that decedent was a "congenial and an excellent worker and that there was no reason why decedent could not have continued to work and receive further promotions." The family was successfully maintaining a savings program and making real estate investments.

Invoking a formula somewhat similar to that employed by Judge Weinfeld in Petition of Marina Mercante Nicaraguense, S.A., 248 F.Supp. 15 (S.D. N.Y.1965), I find that plaintiff and her two children have sustained total general damages in the sum of $130,000.00. I find it unnecessary to give the details on which I arrive at this figure. Allowable medical and funeral expenses would be in addition to the general award.

During the course of the trial, objections were made to the receipt in evidence of plaintiff's Exhibits 16 and 18 through 24. The objections are overruled as to 16 and 23 and sustained as to the remainder. I do not believe that Roberts' original statement, Exhibit 18, tends to impeach his deposition, Exhibit 23. Inasmuch as Nielson, Hull, Bonebrake, Williamson and Ferguson testified in the trial, the admission of their depositions would serve no useful purpose.

The foregoing shall serve as my findings and conclusions. A conforming judgment reflecting my findings and conclusions, using appropriate language to permit an immediate appeal, shall be drafted, served and presented by counsel for plaintiff.