**Richard GIVENS, Plaintiff,**

v.

**M/V CALYPSO, Official No. 594051, its engines, tackle, furniture, equipment and apparel, In Rem, and Gary Stewart, Bruce E. Joyce, and Rudolph K. Johanson, its owners, In Personam, Defendants.**

**No. C79–1403B.**

United States District Court, W. D. Washington.

Feb. 8, 1982.

Charles M. Davis, Seattle, Wash., for plaintiff.

Donald P. Marinkovich and Greg Fuller of Detels, Draper, Madden & Crockett, Seattle, Wash., for defendants.

## MEMORANDUM OF DECISION

BEEKS, Senior District Judge.

Plaintiff brings this action to recover damages for personal injuries allegedly sustained on April 22, 1979, while employed as a member of the crew of the M/V CALYPSO, a commercial fishing vessel owned by defendants. At the time of the occurrence which gives rise to this lawsuit, the vessel was engaged in fishing for tanner crab in the vicinity of Dutch Harbor, Alaska. The gravamen of the action is the alleged negligence of the defendants and the unseaworthiness of the vessel. Trial on said issues of liability was had before this court on August 18, 1981.

The CALYPSO is 98 feet in length and 24 feet in breadth. The crab pots were typical of those used in the crabbing industry. Each was square, measuring 6½ feet in width and length, 32 inches in height, weighed approximately 700 pounds, and was permanently equipped with a bridle. The vessel was equipped with two cranes, a crab block and a pot launcher. One crane, the "picking boom," was located immediately abaft the house on the main or afterdeck at the center line of the vessel. In length it extended to the pot launcher, which was located on the starboard side of the deck and bulwark and forward of the area used to stow pots. The crab block was located at the after starboard corner of the house. The deck crane was a hydraulic telescoping

crane located on the port side of the main deck a short distance forward of amidships. The controls to the deck crane, located at the after end of the house on the starboard side, slightly inboard of the crab block, enabled the operator, Wes Salmonson, to manipulate the deck crane horizontally or vertically. This in turn permitted the raising or lowering of the wire fall, at the end of which a cargo hook was attached.

The hauling procedure utilizes each piece of the above-mentioned gear. The pot line is first hauled in through the crab block. Once the pot is hauled up, the cargo hook from the forward picking boom is attached to the bridle on the pot, and the crab block is disengaged. The pot is then raised by use of the picking boom to a location above the pot launcher. Two members of the crew, one on either side of the pot, then guide it down to the launcher. When so positioned, the picking boom is disconnected and a crewman clears the pot of crab, removes the old bait, coils the pot line, places it inside the pot and secures the opening. Thereafter, a member of the crew secures the cargo hook from the deck crane to the pot and it is then dragged from the launcher to the afterdeck where it is stowed athwartships (port to starboard) resting on a side. Once properly positioned, the pots are lashed together.

This procedure requires the crew engaged in stowing to manually maneuver the pots flush against one another to assure tight and efficient stowage. Frequently, a pot hangs up on another, thus requiring additional crane manipulation. The crane operator is primarily responsible for separating snagged pots, but if his efforts fail, he then calls for manual assistance. Hangups occur less frequently with substantial seas because the pitching and/or rolling of the vessel "shakes loose" or separates the pots from one another. On the day in question, the seas were relatively calm with occasional swells five to eight feet in height.

At 0800, April 22, 1979, the crew had been engaged in hauling pots for about an hour. One complete row of seven pots and five pots of a second row, forward of the first row, had been stowed. When Salmonson dragged the next, or thirteenth, pot aft, it hung up on the pot previously stowed, at a point about five inches above the deck, with its after end closer to the starboard rail than the forward end. The pot was thus tipped forward and to the starboard to such an extent that the 32 inch side was nearly flush to the deck. This positioning created two points of contact, one where the pot met the deck, and the other at the point of hangup on the other pot, which together with the upward force from the hauling line stabilized the pot.

Some effort was made by Salmonson to clear the pot with the crane. Unable to do so in the time he devoted to the endeavor, he called to plaintiff and Flood, another deckhand, to manually assist with the pot. At this point, there are substantial differences in the various accounts related by the witnesses. It is clear, however, that only ten to fifteen seconds elapsed between the call and the moment of injury to Givens.

Plaintiff and Flood approached the pot. Flood positioned himself inboard of the pot, while Givens went to the starboard or outboard side with the result that the stowed pots were to his left and the starboard rail was to his back. Givens was standing in an area approximately seven feet square and immediately began pushing and pulling vigorously on the pot, endeavoring to shake it loose. While so engaged, Givens was working between the pot and the rail. This position was contrary to a well-established rule aboard the CALYPSO that the crew was to stay clear of the area between the pots and the rail, a rule which was known to Givens. The master of the CALYPSO stressed safety with his crew. In fact, he required his crew to always wear hard hats, a precaution not standard in the industry.

When Flood realized Givens' peril, he backed away from the pot and shouted to Givens to get out of that area. Other crew members also shouted warnings, but it is not clear that there was sufficient time for Givens to respond before the pot fell and pinned his head to the rail. Concurrent with the above events, a roller struck the vessel and she rolled to starboard.

While Givens was positioned between the pot and the rail and the vessel was rolling,

Salmonson, without prior indication that he intended so to do, altered the position of the crane allowing excess slack in the fall to which the pot was attached. While he intended to drop the pot to the deck to gain stability, it tipped sufficiently to starboard to become unbound, fall, and finally to strike Givens. While Salmonson's motive may have been proper, the time of execution certainly was not.

 Plaintiff has not established that the CALYPSO was unseaworthy. At best, the events and actions at issue could only be characterized as instantaneous unseaworthiness, which is not actionable except insofar as it constitutes negligence. *Tim v. American President Lines, Ltd.*, 409 F.2d 385 (9th Cir. 1969). To rule otherwise would "subvert the fundamental distinction between unseaworthiness and negligence [the Supreme Court has] so painstakingly and repeatedly emphasized in [its] decisions." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 500, 91 S.Ct. 514, 518, 27 L.Ed.2d 562 (1970).

 That Salmonson was negligent is without doubt. He owed a duty to his fellow crewmen to either operate the crane in a manner that would not create an unreasonable risk to their safety or to give sufficient warning of his intent to so do, thereby allowing them to seek a safe position. Salmonson breached that duty when he slackened the fall, thereby allowing the pot to fall and strike plaintiff while he was in a position of peril between the pot and the rail. There is no doubt but that Salmonson's negligence was a substantial factor in bringing about the injury to plaintiff, and thus, a legal cause of his injuries. *Palmer v. Apex Marine Corp.*, 510 F.Supp. 72 (W.D.Wash.1981). Thus, defendants are liable to Givens as Salmonson's negligence is imputed to them as owners of the vessel, under the doctrine of respondeat superior.

 I find also, however, that Givens was contributorily negligent, thus requiring any award to be reduced by the percentage to which this negligence contributed to the injuries. Givens was fully aware of the above-discussed rule and there was no par-ticular need for disregarding it. Nonetheless, it appears that the master of the CALYPSO followed the common practice of hiring temporary crewmen with the idea in mind that if they proved themselves to be good seamen, they would have a chance for a permanent position should one arise. Givens wanted a permanent position and tried hard to prove himself a worthy crewman. It appears to the court that he may have maximized his effort to so do at the expense of prudence. In any event, the court finds his negligence contributed equally with that of defendants to his injuries.

Accordingly, plaintiff is entitled to a recovery of damages yet to be determined, which, once established, shall be reduced by 50%. Counsel for the parties are directed to appear for a conference before this court on the 11th day of March, 1982, at 11:15 a. m., for the purpose of scheduling a hearing regarding the issue of damages.

This Memorandum of Decision shall constitute the court's findings of fact and conclusions of law on the issue of liability pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.