Susan E. DAUGHENBAUGH,
Plaintiff–Appellant,
Cross–Appellee,

v.

BETHLEHEM STEEL CORP., GREAT LAKES STEAMSHIP DIV.,
Defendant–Appellee, Cross–Appellant.

Nos. 88–3774, 88–3787.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 14, 1989.

Decided Dec. 14, 1989.

Gary William Baun, Birmingham, Mich., Leonard C. Jaques (argued), The Jaques Admiralty Law Firm, Detroit, Mich., for plaintiff-appellant cross-appellee.

William D. Carle, III (argued), Cleveland, Ohio, Ray, Robinson, Hanninen and Carle, for defendant-appellee cross-appellant.

Before KEITH and MARTIN, Circuit Judges, and ENGEL, Senior Circuit Judge.*

KEITH, Circuit Judge.

Plaintiff Susan E. Daughenbaugh ("plaintiff"), as Administrator of the Estate of Gregory J. Daughenbaugh ("Daughenbaugh"), initiated this action to recover compensation for the drowning death of her seaman husband. Proceeding under the Jones Act, 46 U.S.C.App. § 688, and the general laws of admiralty, plaintiff sued defendant Bethlehem Steel Corporation, Great Lakes Steamship Division ("defendant"), the shipowner that employed her husband at the time of his death. The district court granted defendant's motion for summary judgment and found that defendant was not liable for Daughenbaugh's death. For the reasons set forth below, we AFFIRM in part and REVERSE in part.

Because summary judgment was entered below, "we construe the material facts properly before the court most favorably to plaintiff." *Luckett v. Continental Engineering Co.*, 649 F.2d 441, 442 (6th Cir. 1981) (summary judgment precluded where depositions of decedent's fellow employees raised substantial questions of fact whether decedent was a "seaman" under the Jones Act).

## I. FACTUAL AND PROCEDURAL BACKGROUND

From January 12, 1979 until his death, Daughenbaugh was an American seaman employed as a Conveyorman[1] aboard the defendant's ship, the M/V Lewis Wilson Foy ("the M/V Foy"), a 1,000 foot Great Lakes carrier. On April 24, 1985, at approximately 1:30 p.m., the M/V Foy arrived at Burlington Northern Ore Dock No. 5 ("the dock") in Superior, Wisconsin. Shortly thereafter, the M/V Foy crew began to load a cargo of rust colored, iron ore pellets.

The dock and the finger of land on which it rests are owned by the Burlington Northern Dock Company, a wholly owned subsidiary of the Burlington Northern Railway Company. The dock occupies the northern 1,500 feet of a slip that is 3,150 feet in length. Although the dock was improved at the time of Daughenbaugh's death with a dirt road running from its northern to southern end, the dock remained unlit and was covered with unimproved soil, iron ore pellets, weeds and trash.

Sailing the Great Lakes on voyages lasting four to five days, the M/V Foy transported iron ore and other bulk freight. Due to the nature of their work, the officers and crew of the M/V Foy were required to live and work aboard ship, 24 hours per day. Because of the restricted living and working conditions of the M/V Foy crew, the off-duty crew would normally request shore leave and "go up the street" for a few beers. When the M/V Foy docked, this activity was often the only available form of recreation. Thus, M/V Foy First Mate Alan Gintz ("Gintz") and First Assistant Engineer Joseph Chirkun ("Chirkun") both testified that after shore leave, it was not uncommon for crew members to return to the M/V Foy in an intoxicated condition. Gintz and Chirkun also testified that the M/V Foy had an unwritten policy that permitted an intoxicated seaman to board ship. To promote safety, however, the intoxicated seaman would be escorted to his room.

Since the officers and crew seldom knew other people in the various Great Lake ports, and because of the men's shared

---

* The Honorable Albert J. Engel became Senior Circuit Judge on October 1, 1989.

1. As the M/V Foy Conveyorman, Daughenbaugh's primary responsibility was to unload the cargo from the ship. Daughenbaugh was also responsible for supervising the Conveyorman Helper and for performing maintenance work, such as servicing the ship's grease bearings.

experience of living and working aboard ship, the M/V Foy officers and crew followed an unwritten rule and policy to look out for each other during shore leave. Gary Gnacinski ("Gnacinski"), an M/V Foy Oiler and Qualified Man in the Engine Department, as well as Gintz and Chirkun, all testified that if a seaman became intoxicated while on shore leave, the officers and crew looked out and cared for him to assure that he returned to the vessel on time and did not injure himself while returning.

On the afternoon of April 24, 1985, at approximately 2:00 p.m., Daughenbaugh finished work on the M/V Foy and received permission from his superior officer, Chirkun, to go on shore leave and to get a haircut. After completing his personal business and errands, Daughenbaugh joined several of the officers and crew of the M/V Foy at the President's Bar, which is located on the southwest corner of 39th Avenue East, and East 2nd Street, in Allouez, Wisconsin. Daughenbaugh spent much of the afternoon and evening of April 24 at the President's Bar, where Chirkun and other crew members purchased drinks for Daughenbaugh. M/V Foy Conveyorman Helper John Wonderly testified that as the evening wore on, Daughenbaugh knocked over at least one drink, fell off his bar stool, and was "cut off" by the bartender.

On the same night, at about 11:00 p.m., M/V Foy Second Assistant Engineer Michael Beaudoin, Chirkun, Gintz and Daughenbaugh were the only crew members remaining at the President's Bar. Because Daughenbaugh was intoxicated and all three men were required to board ship before sailing time, Chirkun and Beaudoin decided to accompany and assist Daughenbaugh back to the M/V Foy. Initially, Beaudoin and Chirkun called a cab, but Daughenbaugh exchanged words with one of the cab's prior passengers. To avoid an altercation, Beaudoin told the cab to leave. Chirkun testified that as the three men began to walk towards the dock, Beaudoin and Chirkun held Daughenbaugh by the arms to assist and encourage him to return to the M/V Foy before sailing time.

Taking a short-cut on a service road, the three men walked to the dock where the M/V Foy was berthed. Both Chirkun and Beaudoin testified that after the three men squeezed through the locked service gate of the dock and began to walk toward the conveyor house, Daughenbaugh ran ahead of them and over an ore pile south of the conveyor house, "like a young boy flying an airplane." Daughenbaugh subsequently disappeared behind the conveyor house.

According to the testimony of Beaudoin, both he and Chirkun believed that Daughenbaugh had gone behind the conveyor house to urinate or vomit. Beaudoin and Chirkun continued walking down the dock toward the conveyor house, but failed to see Daughenbaugh as they approached the building. Looking again for Daughenbaugh, Beaudoin and Chirkun walked ahead a short distance. Both men then became concerned that Daughenbaugh might have fallen down or otherwise injured himself. When Daughenbaugh did not appear, Chirkun waited while Beaudoin went back to look around the conveyor building. Beaudoin testified: "I looked around for him. I yelled for him. I looked towards the water. I didn't go to the slip itself and look down into the water." Deposition of Michael C. Beaudoin, Joint Appendix at 61 [hereinafter Appendix].

Beaudoin and Chirkun then began to walk towards the M/V Foy. En route, they met Gnacinski, who was headed into town. According to the testimony of Beaudoin and Chirkun, they told Gnacinski that they believed that Daughenbaugh had returned to town and asked Gnacinski to keep an eye out for Daughenbaugh. According to the testimony of Gnacinski, he did not recall Chirkun or Beaudoin ever mentioning that they thought Daughenbaugh had possibly returned to town. The district court found that Beaudoin and Chirkun "informed other members of the crew to watch for Daughenbaugh since they did not know where he went and suspected he returned to town." *Daughenbaugh v. Bethlehem Steel Corp.*, No. 86–2498, mem. op. at 5 (N.D.Ohio Aug. 3, 1988) [hereinafter Opinion].

On his way into town, Gnacinski met Gintz, who had just left the President's Bar and was on his way back to the M/V Foy. Gnacinski explained that Beaudoin and Chirkun had last seen Daughenbaugh on the dock. Gintz responded that he had not seen Daughenbaugh. Gintz then asked Gnacinski to keep an eye out for Daughenbaugh and to check the local bars for him. Obeying Gintz's order, Gnacinski looked in the window of the President's Bar, but did not see Daughenbaugh. Remaining in the vicinity of the President's Bar, Gnacinski checked around a closed bowling alley and two closed bars, but again did not find Daughenbaugh. At approximately midnight, Gnacinski returned to the President's Bar.

Gnacinski then asked Kristy Stariha ("Stariha"), the bartender at the President's Bar, if she had seen Daughenbaugh. Stariha replied that Daughenbaugh had been in earlier, that she had to "shut him off", and that she hoped he was not coming back. After having a few beers, Gnacinski departed the President's Bar by his watch at 12:35 p.m. Although Gnacinski took the "short cut" back to the dock, he did not see Daughenbaugh at the President's Bar or during his return walk to the M/V Foy.

According to the testimony of Stariha, Daughenbaugh returned to President's Bar *after* Gnacinski left. Without additional comment on conflicting evidence presented by plaintiff, the district court concluded that an "unrebutted affidavit of defendant's shows Daughenbaugh returned to the President's Bar after running away from the officers, [Beaudoin and Chirkun]." Opinion at 6.

At approximately 3:00 a.m., Beaudoin was awakened for duty. After discovering that Daughenbaugh's room was empty, Beaudoin received permission from Gintz to search the vicinity of the dock where Daughenbaugh was last seen. After searching the dock with a high-powered flashlight for about 30 minutes, Beaudoin returned to the M/V Foy and informed Gintz of his failure to find Daughenbaugh.

As the crew finished loading the M/V Foy, Gintz instructed the Wheelman to call the bars in town that were open. After receiving a report that Daughenbaugh was not in any of the open bars and had not been seen, Gintz informed the Master of the M/V Foy, Edward Fitch, that Daughenbaugh was missing. The M/V Foy sailed at 4:25 a.m. without Daughenbaugh.

Daughenbaugh was not seen again until his body was found approximately three weeks later, on May 15, 1985. Daughenbaugh's body was found floating in the slip near the extreme south end of the dock.

On June 16, 1986, plaintiff filed a complaint against defendant, her husband Daughenbaugh's employer, and alleged negligence under the Jones Act, 46 U.S.C.App. § 688, and unseaworthiness pursuant to general maritime law. Plaintiff argued that defendant acted negligently by failing to furnish Daughenbaugh with a safe place in which to work. Moreover, defendant failed to properly look out and care for Daughenbaugh. In addition, defendant failed to furnish Daughenbaugh with a safe means of ingress and egress to and from the ship. Arguing that defendant's negligence resulted in the loss of life, plaintiff sought recovery for Daughenbaugh's wrongful death.

After substantial discovery, defendant moved, on July 2, 1987, for summary judgment on all claims. Defendant argued that it was entitled to summary judgment on plaintiff's Jones Act claim because: first, Daughenbaugh was not acting in the scope of his employment at the time of his disappearance; second, defendant owed Daughenbaugh no duty with respect to shore conditions; third, the M/V Foy officers that escorted Daughenbaugh back to the dock were not acting in the scope of their employment; and fourth, plaintiff failed to present evidence demonstrating that defendant proximately caused Daughenbaugh's death. On the unseaworthiness claim, defendant maintained that defendant owed Daughenbaugh no duty with respect to shore conditions, and that plaintiff failed to present evidence demonstrating that defendant proximately caused Daughenbaugh's death.

Plaintiff responded to defendant's motion on January 28, 1988. Plaintiff argued that defendant's proffered grounds for summary judgment were insufficient. Plaintiff also contended that summary judgment was inappropriate because of the existence of several genuine issues of material fact.

On August 3, 1988, the district court granted summary judgment in favor of defendant on all claims. Disposing of the Jones Act claims, the court held that "Daughenbaugh was in the scope of his employment" when last seen by Beaudoin and Chirkun. Opinion at 2–3. The court then found that defendant owed Daughenbaugh a duty of care under the Jones Act because of the company's "unwritten policy allowing drunken seamen to return to the vessel." Opinion at 4. The court also found that defendant owed Daughenbaugh a duty of care because of the "common practice," in which the company acquiesced, whereby M/V Foy officers and crew escorted intoxicated seamen from town bars back to the dock and into their cabins, thereby ensuring their "safety and the ship's." Opinion at 4.

The district court decided, however, to grant summary judgment in favor of the defendant because the M/V Foy officers that escorted Daughenbaugh did not act negligently:

The facts and depositions of this case show Beaudoin used at least ordinary and reasonable care in searching for Daughenbaugh after he voluntarily ran away from the officers. An unrebutted affidavit of defendant's shows Daughenbaugh returned to the President's Bar after running away from the officers, releasing the officers, after a reasonable search, from any duty undertaken [sic]. Therefore, the officers did not act negligently in escorting Daughenbaugh back to the ship nor in trying to find him. Without the negligence of the officers, the employer cannot be held liable on this action under the Jones Act.

Opinion at 6. Disposing of plaintiff's unseaworthiness claim, the district court assumed that the dock was an appurtenance to the ship. The court held, however, that plaintiff had shown no facts upon which the court could infer proximate cause. Opinion at 6–7.

Plaintiff filed a notice of appeal in this court on August 19, 1988. Defendant filed a notice of cross-appeal on August 23, 1988.

## II.  STANDARDS OF REVIEW

### A.  THE JONES ACT

Historically, when a seaman sustained an injury or illness aboard ship, he was entitled to receive treatment ashore. Until the seaman recovered, the shipmaster would provide him with "maintenance," the cost of food and lodging, and "cure," the cost of medical care. See *Vella v. Ford Motor Co.*, 421 U.S. 1, 3, 95 S.Ct. 1381, 1382, 43 L.Ed.2d 682 (1975); G. Gilmore & C. Black, *The Law of Admiralty* 253–79 (1957) [hereinafter G. Gilmore & C. Black]. The general laws of admiralty, however, precluded the seaman from recovery for personal injuries caused by the negligence of the shipmaster or a member of the crew. *See The Osceola*, 189 U.S. 158, 172–73, 23 S.Ct. 483, 485–86, 47 L.Ed. 760 (1903). In 1920, Congress passed the Jones Act, 46 U.S.C.App. § 688, which removed this obstacle to recovery by granting each seaman the right to damages for injuries resulting from the shipmaster's negligence. *See* Merchant Marine Act of 1920, ch. 250, § 33, 41 Stat. 988, 1007 (codified at 46 U.S.C.App. § 688). The Jones Act "protects the seaman whether he is on land or on the water so long as he is in the course of his employment." *McDonough v. Buckeye S.S. Co.*, 103 F.Supp. 473, 475 (N.D.Ohio 1951), *aff'd*, 200 F.2d 558 (6th Cir.1952), *cert. denied*, 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357 (1953). *See also O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 42, 63 S.Ct. 488, 491, 87 L.Ed. 596 (1943). The Jones Act provides in relevant part:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the commonlaw right or reme-

dy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.

46 U.S.C.App. § 688.

Our application of the Jones Act must follow the judicially developed doctrine of liability granted to railroad workers by the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq. The Jones Act is modeled after, and specifically incorporates, FELA, which provides for liability when an injury results "in whole or in part" from the negligence of the employer. *See* 45 U.S.C. § 51. *See also O'Donnell*, 318 U.S. at 38, 63 S.Ct. at 489. In *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the Supreme Court held under FELA, and by reference the Jones Act, that "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.* at 506, 77 S.Ct. at 448.

Our interpretation of the Jones Act relies substantially upon the general principles of maritime law "unknown to the common law. These principles include[ ] a special solicitude for the welfare of those men who ... venture upon hazardous and unpredictable sea voyages." *Moragne v. States Marine Lines*, 398 U.S. 375, 387, 90 S.Ct. 1772, 1780, 26 L.Ed.2d 339 (1970). *See also* G. Gilmore & C. Black, *supra*, at 1–11, 253. Moreover, "it is a settled canon of maritime jurisprudence that ' "it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules." ' " *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 281–82, 100 S.Ct. 1673, 1677, 64 L.Ed.2d 284 (1980) (quoting *Moragne v. States Marine Lines*, 398 U.S. 375, 387, 90

S.Ct. 1772, 1780, 26 L.Ed.2d 339 (1970) (quoting *The Sea Gull*, 21 F.Cas. 909, 910 (No. 12,578) (CC Md.1865))).

In *Socony–Vacuum Co. v. Smith*, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939), the Supreme Court explained that Congress intended the Jones Act to expand, not limit, admiralty's protection of its wards:

> The seaman, while on his vessel, is subject to the rigorous discipline of the sea and has little opportunity to appeal to the protection from abuse of power which the law makes readily available to the landsman.... He cannot leave the vessel while at sea. Abandonment of [the vessel] in port before his discharge ... exposes him to the risk of loss of pay and to the penalties for desertion.... Withal, seamen are the wards of admiralty, whose traditional policy it has been to avoid, within reasonable limits, the application of rules of the common law which would affect them harshly because of the special circumstances attending their calling.

*Id.* at 431, 59 S.Ct. at 266. Thus, for these reasons, the Jones Act justifiably affords the seaman a right to recover damages arising from maritime torts. *See id.* As remedial legislation enacted for the protection and benefit of the seaman, the Jones Act "is entitled to a liberal construction to accomplish its beneficent purposes." *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949). *See also Garrett*, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239 (1942); *Socony–Vacuum Co.*, 305 U.S. at 431, 59 S.Ct. at 266.

## B.  SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As we consider the appropriateness of summary judgment in the case at bar, we must examine the record taken as a whole to deter-

mine whether the non-moving party has raised a genuine issue of material fact. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court clarified the standard for review:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. at 2552.

In recent years, the Supreme Court has liberalized the use of summary judgment. *See, e.g., Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2554 (encouraging use of summary judgment to ensure just, speedy and efficient determinations in each case). The Court, however, has not approved summary judgments that rest on credibility determinations. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the Court explained, in *Anderson*, that "[c]redibility determinations, the weighing of the evidence, and the drawing of the legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* at 255, 106 S.Ct. at 2513.

■ Our consideration of the propriety of summary judgment in the case at bar is animated by two additional concerns. First, we have previously explained that "there is eminent authority in support of the proposition that issues of negligence are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner." *Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir. 1965). Second, in light of the "policy of providing an expansive remedy for seamen, submission of Jones Act claims to a jury requires a very low evidentiary threshold; even marginal claims are properly left for

jury determination." *Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979). *See also Searcy v. E.T. Slider, Inc.*, 679 F.2d 614, 616 (6th Cir.1982); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (9th Cir.1981).

## III. APPLICATION OF MODERN MARITIME LAW

### A. THE CLAIM OF THE SHIPMASTER

■ In the cross-appeal, defendant argues that we should affirm the summary judgment on the alternative ground that plaintiff's Jones Act claim must be denied because her decedent Daughenbaugh was not acting "in the course of his employment" at the time of his death. We disagree.

In *Braen v. Pfeifer Oil Transportation Co.*, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959), the Supreme Court explained that maintenance and cure cases "supply relevant guides to the meaning of the term 'course of employment' under the [Jones] Act since it is the equivalent of the 'service of the ship' formula used in the maintenance and cure cases." *Id.* at 132–33, 80 S.Ct. at 249–50. The Court had previously held, in *Warren v. United States*, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951), that a seamen injured in a dance hall while on shore leave was in the service of the ship and entitled to maintenance and cure. *Id.* at 530, 71 S.Ct. at 436. Moreover, in *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), the Court held that a "sailor departing or returning from shore leave" enjoys "the broad protection of his right to maintenance and cure." *Id.* at 736, 63 S.Ct. at 936–37. To justify the extension of shipboard protections to the seaman ashore, the *Aguilar* Court explained:

> Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is neces-

sary if the work is to go on, more so that it may move smoothly.

No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it.... [S]hore leave is an elemental *necessity* in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.... In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly, it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment.

*Id.* at 733–34, 63 S.Ct. at 935–36 (emphasis added).

Following the teachings of the Supreme Court, numerous lower courts have held that when a seaman is traveling along a standard route to leave the ship and go ashore or to return to the ship from shore leave, the seaman is acting within the course of his employment under the Jones Act. *See, e.g., Marceau v. Great Lakes Transit Corp.,* 146 F.2d 416, 418 (2d Cir. 1945), *cert. denied,* 324 U.S. 872, 65 S.Ct. 1018, 89 L.Ed. 1426 (1945); *Williamson v. Western Pacific Dredging Corp.,* 304 F.Supp. 509, 515–16 (D.Or.1969), *aff'd,* 441 F.2d 65 (9th Cir.1971), *cert. denied,* 404 U.S. 851, 92 S.Ct. 90, 30 L.Ed.2d 91 (1971); *Nowery v. Smith,* 69 F.Supp. 755, 757 (E.D. Pa.1946), *aff'd,* 161 F.2d 732 (3d Cir.1947). Moreover, in *McDonough v. Buckeye S.S. Co.,* 103 F.Supp. 473 (N.D.Ohio 1951), *aff'd,* 200 F.2d 558 (6th Cir.1952), *cert. denied,* 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357 (1953), this court affirmed the district court's finding that an intoxicated seaman, returning from shore leave, was acting in the course of his employment for purposes of the Jones Act. *McDonough,* 200 F.2d 558.

Given the weight of the authority provided by *Braen, Warren* and *Aguilar,* and the holding of the Sixth Circuit's controlling case, *McDonough,*[2] we have concluded that the district court did not err in finding that "Daughenbaugh was in the scope of his employment when last seen by the ship's officers." Opinion at 3. First, we are persuaded that Daughenbaugh, like the seaman in *Aguilar,* was properly deemed on defendant's business while returning from shore leave, because shore leave for the crew is beneficial and *necessary* to defendant's continued operation of the M/V Foy. *See Aguilar,* 318 U.S. at 733–34, 63 S.Ct. at 935. Second, the record reveals that even though Daughenbaugh, at the time of his death, was not performing routine tasks at the request of defendant, Daughenbaugh was "generally answerable to [the shipmaster's] call to duty." *Farrell v. United States,* 336 U.S. 511, 516, 69 S.Ct. 707, 709, 93 L.Ed. 850 (1949). Gintz, Daughenbaugh's superior officer, testified that if an M/V Foy crew member failed to return to the vessel at the sailing time posted by the First Mate, then the crew member was subject to discipline and discharge. Thus, because Daughenbaugh was required to return to the ship before the appointed sailing time, he was acting in the course of his employment when, en route to the M/V Foy, he disappeared on the dock.

**2.** We decline defendant's invitation to follow the opinion of the Seventh Circuit in *Petition of Atlass,* 350 F.2d 592 (7th Cir.1965), *cert. denied,* 382 U.S. 988, 86 S.Ct. 551, 15 L.Ed.2d 476 (1966), or the Supreme Court of Michigan in *Szopko v. Kinsman Transit Co.,* 426 Mich. 653, 397 N.W.2d 171 (Mich.1986), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). Initially, both of these opinions are "anomalies" among the numerous decisions, cited in the text, that support "the rule that a seaman on shore leave, at least when he is leaving the ship or returning to it, is within the course of his employment under the Jones Act." *Szopko,* 426 Mich. at 674–75 n. 2, 397 N.W.2d 171 (Levin, J., concurring). Additionally, *Atlass* is clearly dis-

tinguishable from the case at bar. In *Atlass,* the Seventh Circuit declined to find negligence where several crew members immediately tried to rescue the two intoxicated seamen who fell into the slip. *Atlass,* 350 F.2d at 601. However, in the present case, Beaudoin and Chirkun, the M/V Foy officers who escorted Daughenbaugh from the President's Bar to the dock and along the slip, failed to immediately initiate any action when Daughenbaugh disappeared. There simply was no rescue attempt or *immediate* search for Daughenbaugh. Moreover, our disposition of the case at bar is controlled by the relevant precedents of the Sixth Circuit. *See Smith v. General Motors Corp.,* 747 F.2d 372 (6th Cir.1984).

Defendant argues that the district court's opinion, concluding that Daughenbaugh was acting in the scope of his employment when last seen, constitutes a blanket endorsement of seamen's claims under the Jones Act. However, defendant's liability under the Jones Act remains substantially limited to injuries negligently inflicted on its employees by its officers or agents. *Hopson v. Texaco, Inc.,* 383 U.S. 262, 263, 86 S.Ct. 765, 766, 15 L.Ed.2d 740 (1966). *See also* 46 U.S.C.App. § 688; 45 U.S.C. § 51. In sum, the district court correctly found that on the night of his disappearance, Daughenbaugh, while returning from shore leave by the route customarily taken by the M/V Foy crew, was acting in the course of his employment.

### B. THE CLAIMS OF THE SEAMAN'S ESTATE

■ On appeal, plaintiff argues that the district court erred in granting summary judgment in favor of defendant on the Jones Act claim. Plaintiff maintains that whether defendant's officers exercised reasonable and ordinary care when they undertook to escort an intoxicated Daughenbaugh from the President Bar—towards the dangerous slip across the hazardous dock—to the ship, and whether defendant's officers exercised reasonable and ordinary care when they undertook the search for Daughenbaugh after his disappearance are

genuine issues of material fact ripe for jury trial. We agree.[3]

In reviewing the district court's disposition of plaintiff's claims, we are mindful that "[c]ourts should exercise special care in considering summary judgment in Jones Act cases which require a very low evidentiary threshold for submission to a jury." *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 770–71 (9th Cir.1981) (under the Jones Act, a jury question is presented if "employer negligence played *any* part at all in the employee's injury") (emphasis added). Moreover, in *Searcy v. E.T. Slider, Inc.,* 679 F.2d 614 (6th Cir.1982), we held that the question of seaman status within the meaning of the Jones Act is generally a question of fact to be determined by the jury. *See id.* at 616.

Our reluctance to dispose of Jones Act claims through summary judgment was shared by the Fourth Circuit in *Van Horn v. Gulf Atlantic Towing Corp.,* 388 F.2d 636 (4th Cir.1968). In *Van Horn,* a shipyard employee sued a barge owner for injuries sustained when the employee slipped and fell on the deck of the barge. *See id.* at 637. Because evidence revealed that grain residue made the deck slippery, the issue of negligence was deemed sufficient to preclude summary judgment. The Fourth Circuit concluded:

> Whether due care under all of the circumstances was observed by the present shipowner at the relevant times and to

---

**3.** On appeal, plaintiff also argues that the district court erred in granting summary judgment in favor of defendant on the unseaworthiness claim. We have concluded, however, that the district court did not err in holding that the plaintiff failed to prove that the conditions on the dock were the *proximate cause* of Daughenbaugh's death. The district court correctly concluded that:

> "It is now well settled that a ship owner owes to the seaman employed on its vessels an absolute, nondelegable duty to provide a seaworthy vessel." *Harbin v. Interlake Steamship Co.,* 570 F.2d 99, 103 (6th Cir.1978), *cert. denied,* 437 U.S. 905 [98 S.Ct. 3091, 57 L.Ed.2d 1135] (1978). However, plaintiff must show injuries suffered were as a result of the unseaworthy condition of the ship or its appurtenances. *Mahnich v. Southern Steamship Co.,* 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561] (1944)....

> Plaintiff attempted to raise questions of fact concerning the condition of the dock and its relative dangerousness. [However,] no causal connection [was] shown between the condition of the dock and the death of Daughenbaugh. No evidence was submitted by plaintiff which would link Daughenbaugh's drowning to the conditions on the dock.

Opinion at 6–7.

Our disposition of plaintiff's Jones Act claim must be distinguished from our disposition of her unseaworthiness claim. We remain unpersuaded by plaintiff's unseaworthiness claim because it *cannot* withstand traditional proximate cause analysis. However, we look favorably upon plaintiff's Jones Act claim because it *can* withstand the liberal causation analysis unique to the Jones Act and FELA. *See Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 774 (9th Cir.1981) (holding that a Jones Act claim was "distinct and separable" from an unseaworthiness claim).

what proportionate extent, if any, [the employee] was at fault are clearly questions for jury determination after a full trial. *See Pope & Talbot v. Hawn,* 346 U.S. 406 [74 S.Ct. 202, 98 L.Ed. 143] (1953). As the noted admiralty text authors, Gilmore and Black, observe regarding negligence under the Jones Act, "[i]t would be a rare court in an unusual case which would take the negligence issue away from the jury...." G. Gilmore & C. Black, *The Law of Admiralty* 311 (1957).

*Van Horn,* 388 F.2d at 639 (emphasis added). After applying these principles to the case at bar, we hold that the district court erred in taking plaintiff's Jones Act claim from the jury. We also hold that the district court erred in deciding as a matter of law that defendant's officers were not negligent, and therefore, that the defendant could not be held liable under the Jones Act.

Our holdings in this modern maritime case stand upon the firm foundation of *McDonough v. Buckeye S.S. Co.,* 103 F.Supp. 473 (N.D.Ohio 1951), *aff'd,* 200 F.2d 558 (6th Cir.1952), *cert. denied,* 345 U.S. 926 (1953), a Sixth Circuit precedent applicable on its facts to the present action.[4] In *McDonough,* a shipmaster authorized his employees to assume control of a seaman who returned from shore leave too intoxicated to be allowed on the dock alone. 103 F.Supp. at 475. In fact, the shipmaster employed a guard who detained the intoxicated seaman at the gate until one of his sober shipmates volunteered to escort him to the ship. *Id.* Instead of discharging his

duty, the sober shipmate, during the course of their walk across the dock, abandoned the intoxicated seaman, who was later found drowned. *Id.* Even though the intoxicated seaman had fallen down on the dock and refused to get up, the district court held that the sober shipmate was negligent in abandoning him and failing to immediately summon help. *Id.* at 476. Finding that the shipmaster knew and acquiesced in the well-established practice of escorting intoxicated seamen back to the ship, and therefore, that the sober shipmate was acting within the scope of his employment, the district court charged the shipmaster with liability for the death of the intoxicated seaman. *Id.* at 477. The court explained:

> [O]ne who voluntarily takes charge of a helpless person must exercise reasonable care for his welfare and safety.... *See* Annotations 5 A.L.R. 513; 120 A.L.R. 1525. The rule has been embodied in the Restatement of Torts § 324.[5] It does not place an onerous burden on shipmasters to require them to exercise ordinary care when they do undertake to escort an intoxicated seaman.... This is particularly true—as in this case—when such assistance is rendered for the benefit of the shipowner as well as the seaman.

*Id.* at 475–76.

■ In the case at bar, the district court initially explained that M/V Foy officers Gintz and Chirkun "both admitted the ship has an unwritten policy allowing drunken seamen to return to the vessel. A drunken seaman would be escorted to his room to ensure his safety and the ship's."

---

4. Our holdings in the present case also find substantial support in *Neal v. Bergland,* 646 F.2d 1178 (6th Cir.1981), *aff'd,* 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983). In *Neal,* we held that the complaint stated a claim for relief against the Farmers Home Administration on the theory that the agency negligently supervised construction of plaintiff's home. *See Neal,* 646 F.2d at 1184. To justify our holding in *Neal,* we relied upon the "principle expressed in § 323 the Restatement (Second) of Torts (1965) that one who undertakes to act, even though gratuitously, is required to act carefully and with the exercise of due care and will be liable for injuries proximately caused by failure to use such care." *Neal,* 646 F.2d at 1181.

5. The Restatement (Second) of Torts provides:
   § 324. Duty of One Who Takes Charge of Another Who is Helpless
   One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused by
   (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
   (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.
   Restatement (Second) of Torts § 324 (1965).

Opinion at 4. Although defendant has no written escort policy, the district court assumed that defendant "was aware of the common practice and acquiesced in it. If so, this would create a duty on the parts of Beaudoin and Chirkun once they undertook the responsibility of escorting Daughenbaugh. Acting in the course of an unofficial policy would impute the liability of the shipowner." *Id.* Thus, an initial question for jury determination is whether defendant's facts indicate that Beaudoin and Chirkun were acting as mere volunteers in escorting Daughenbaugh[6] or whether plaintiff's facts indicate that Beaudoin and Chirkun negligently executed defendant's recognized and well-established company policy.

As a matter of law, the district court found that defendant's officers were not negligent because the affidavit of Stariha, the bartender, "shows Daughenbaugh returned to the President's Bar *after* running away from the officers, releasing the officers, after a reasonable search, from any duty undertaken." Opinion at 6 (emphasis added). On appeal, defendant argues that Stariha's affidavit is unrebutted. Plaintiff, however, issues a number of counter arguments. First, plaintiff maintains that Stariha's affidavit, which was given more than two years after Daughenbaugh's disappearance, lacks credibility. Stariha's affidavit fails to mention that Daughenbaugh left the President's Bar with his two superior officers. Instead, it indicates that he left earlier with others; thereby indicating that Stariha's ability to accurately recall the events surrounding Daughenbaugh's alleged return to the President's Bar is questionable. Second, Stariha's statement that Daughenbaugh returned to the President's Bar is rebutted by the testimony of Gnacinski, who unsuccessfully searched for

Daughenbaugh at the President's Bar and the other bars in town, and the testimony of Gintz, who instructed the Wheelman to call all of the bars in town. Third, plaintiff argues that if Beaudoin and Chirkun had exercised reasonable and ordinary care in escorting Daughenbaugh back to the M/V Foy, and had immediately pursued him when he ran away from them on the dock, then Daughenbaugh's alleged return trip to the President's Bar would have been avoided.

We are persuaded that the district court erred in holding, as a matter of law, that defendant's officers were released from their duties by Daughenbaugh's alleged return trip to the President's Bar. It is not the function of this court, however, to weigh the evidence and to determine the credibility of the Stariha affidavit, as well as the conflicting testimony of Gnacinski and Gintz. Interpreting conflicting evidence and determining the credibility of witnesses are functions within the unique province of the jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus, whether Daughenbaugh returned to the President's Bar after defendant's officers last saw him is a genuine issue of material fact which should be resolved by jury trial.

In discussing the standard of care that was provided by defendant's officers before an intoxicated Daughenbaugh allegedly released them from their duties, the district court explained that Beaudoin used at least ordinary care in looking for Daughenbaugh after he disappeared. Opinion at 6. Contrary to the holding of the district court, a jury might well conclude that more than a cavalier walk around the con-

---

6. Defendant argues that if there was a policy of escorting intoxicated seamen back to the M/V Foy after shore leave, there is no evidence that defendant authorized the policy or had knowledge of it. Under the law, however, knowledge by the M/V Foy officers themselves could be imputed to defendant. *Cf.* Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton On Torts* 502 (4th ed. 1984) ("[The employer's] vicarious liability, for conduct which is in no way his own, extends to any and all tortuous conduct of the

servant which is within the 'scope of employment.'"). Moreover, defendant knew that intoxicated seamen were allowed to board the M/V Foy, and therefore, should have known that it was benefiting from a common and well-established escort practice. *Cf. International Distributing Corp. v. American Dist.,* 569 F.2d 136, 139 (D.C.Cir.1977) (suggesting that a principal may be held liable where the tort perpetrated by his agent was motivated, in whole or in part, by a purpose to serve the principal).

veyor house was expected from Beaudoin and Chirkun, officers of the M/V Foy. Like the sober shipmate in *McDonough*, Beaudoin and Chirkun did not succeed in safely returning Daughenbaugh to the M/V Foy. Initially, they failed to *take charge* of an *intoxicated* Daughenbaugh so that he would not flee as they walked from the President's Bar to the M/V Foy. In addition, Beaudoin and Chirkun declined to chase after Daughenbaugh when he ran away, increasing his risk of injury on the dock or in the slip. Moreover, they failed to immediately initiate a *comprehensive search* (involving several men equipped with high-powered flashlights) of the town bars, the dock and the slip. Finally, Beaudoin and Chirkun failed to *immediately notify* the ship's captain and crew of the obvious and imminent danger that Daughenbaugh faced. Even though an *intoxicated* Daughenbaugh disappeared *on the dock* at approximately 11:45 p.m., Fitch, the Master of the M/V Foy, was not informed that Daughenbaugh was missing until approximately 3:30 a.m.

Thus, two additional issues of material fact are apparent: first, whether Beaudoin and Chirkun exercised ordinary and reasonable care as they escorted an intoxicated Daughenbaugh over the dock and along the slip; and second, whether Beaudoin and Chirkun exercised reasonable and ordinary care when they undertook to search for Daughenbaugh after his disappearance. We are persuaded that several questions regarding defendant's negligence—through its officers—raise genuine issues of material fact which should have precluded summary judgment on plaintiff's Jones Act claim.

## IV. CONCLUSION

On plaintiff's Jones Act claim, we reverse the order of the district court granting summary judgment in favor of defendant. We remand to determine whether, under the Jones Act, Daughenbaugh's death resulted in whole or in part from the negligence of defendant. In all other respects, we affirm the order of the district court.

Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

ENGEL, Senior Circuit Judge, concurring.

I concur fully in the result and in most of the analysis contained in Judge Keith's very comprehensive and thoughtful opinion. Likewise, while I agree that the facts on motion for summary judgment are to be construed most stringently against the moving party, I am unable to join in the more generalized factual conclusions contained in the last two paragraphs of Part III. I would not necessarily conclude from the proofs before the district court that Beaudoin and Chirkun did no more than take a "cavalier walk" around the conveyor house, nor that they are automatically to be faulted for having failed to take charge of an intoxicated Daughenbaugh so that he would not flee. This seems to imply an absolute duty as a matter of law, a duty which a jury could easily find that reasonable persons in their position could not have performed. I also cannot conclude that their search was not comprehensive, any more than I can conclude that it was comprehensive. Further, I am unable to conclude that they are to be faulted automatically for failing to immediately notify the ship's captain when the conduct they encountered could occur every time a person did not show up on time. These are all conclusions a jury could reach under the facts. However, a jury could also conclude upon the same evidence that Beaudoin and Chirkun did everything they reasonably could do under the circumstances as they appeared to them at the time, including searching, notifying the captain, and requesting their fellow seamen to keep an eye out for Daughenbaugh should he return to the President's Bar.

Likewise, reasonable minds might assign different credibility to the testimony of Stariha that Daughenbaugh reappeared at the President's Bar. Cases often arise where seemingly undisputed facts, individ-

ually challenged, raise internal conflicts and are the subject of differing inferences.