**In re Petition of AQUACULTURE FOUNDATION FOR EXONERATION FROM OR LIMITATION OF**

United States District Court,
D. Connecticut.

Aug. 26, 1999.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GOETTEL, District Judge.

*FINDINGS OF FACT*

This is a claim brought under the Jones Act, 46 U.S.C.App. 688. The claimant, George Dobrovich, ("Dobrovich") is a 55 year old schooner Captain. He received his Master's license from the Boston office of the Coast Guard in January of 1994 for 25 gross tons based on his experience in the Navy and on his own boats. After working as a deck hand on the LIBERTY BELL in 1994, he increased his tonnage to 50. Dobrovich then worked on the QUINNIPIAC in 1995.

Aquaculture Foundation is a not-for-profit, marine environmental organization which provides marine educational programs to the public school systems and private organizations. Aquaculture Foundation hired Dobrovich to captain the JOHN E. PFRIEM in April of 1995 and paid him $15 per hour. On voyages there

were two additional crew members. The JOHN E. PFRIEM was docked at the Hotchkiss dock, in Milford, Connecticut harbor. The JOHN E. PFRIEM had been docked at the Hotchkiss dock for a couple of years prior to Dobrovich's accident.

The Hotchkiss dock is owned by Leslie Hamel, daughter of Al Hotchkiss. Al Hotchkiss built the ramp and floating docks and lives on the property where the JOHN E. PFRIEM was docked. Hotchkiss allowed Aquaculture Foundation to dock the JOHN E. PFRIEM at the Hotchkiss dock. The students and members of the public boarded the vessel (a ketch with sails but no engine) from the Milford town dock located up river from the Hotchkiss dock.

Aquaculture Foundation has no ownership interest in, or control over, Hamel's property, ramp and floating docks. Access to the JOHN E. PFRIEM was by a gravel path located beside the road, which led to a ramp connecting the land to a series of floating docks. The vessel was docked at the last of the floating docks, about 100 feet from the ramp. It was, therefore, necessary to use the ramp to reach the vessel.

The permission to use the property included ingress/egress across the property to the vessel from the street at any time of the day as required by the needs of the operation. It also included permission to do maintenance and repair and to bring materials to the vessel. Dobrovich had boarded the JOHN E. PFRIEM around ten times and worked about nine days (70 hours) for Aquaculture Foundation prior to his accident.

On the morning of May 5, 1995, the weather was calm and the skies overcast. However, it had rained earlier in the morning and the ramp as well as other surfaces were still wet. Around 9:00 a.m. on May 5, 1995, Dobrovich parked his car on the side of the road and proceeded to walk the gravel path toward the ramp. He intended to board the vessel which was then unoccupied to make repairs. While going down the ramp Dobrovich slipped. He slid all the way down the ramp to where it met a floating dock. In the course of this his leg tangled with the railing on the side of the ramp causing several fractures in his ankle. He does not know why he slipped and was aware of no foreign substances on the ramp. However, the evidence gave a good indication as to what caused him to slip.

Al Hotchkiss had purchased the property some fifty or more years earlier, built a home and began a marine construction business utilizing the property as its base of operations. Ultimately he had several vessels including a small tug. For these he had constructed a number of floats secured along the waterfront side of the property accessible by a ramp. The ramp is nineteen and a half feet long and has two oblong handrails which are six inches wide running the length of the ramp. The rails are quite far apart so that it is difficult to hold both rails at once. Hotchkiss intentionally made the railings this wide and so far apart so that he could slide heavy items down or carry cans in both hands while he walked down. A flat handrail six inches wide does not afford easy grasping by a human hand.

The ramp was secured with a hinge device on its landward side. The other end rested its weight on wheels on the first float. This permitted the wheels and the end of the ramp to slide linearly on the float as it rose and fell with the tide.

The ramp and system of floats were designed and constructed for the marine business pursuits of Al Hotchkiss. The property was not open to the public excepting for the limited use permitted employees of Aquaculture in the operation of the vessel JOHN E. PFRIEM.

The Hotchkiss property is located in Milford Harbor which has navigable tidal waters having a range of about 7 ½ to 8 feet. The height of the tide is subject to variations depending generally on the posi-

tion of the sun and moon which produce neap and spring tides. These variables result in the ramp sloping in a downward angle towards the water. At the time in question there was a full low tide and the ramp had an angle of inclination approaching 30°.

The ramp was made of wood which when wet loses much of its coefficient of friction. The ramp also incorporates cleating consisting of horizontal wood strips laid across the width. As originally constructed, there were 12 cleats spaced approximately 17 inches apart which is approximately one cleat at every third plank. The ramp is constructed entirely of wood without any covering or non-skid adhesive features other than the cleating. These cleats were intended to prevent slipping. However, the third cleat down, which was in the area where Dobrovich slipped was missing. It is possible that Dobrovich was holding a cup in one hand. However, considering the distance between the two handrails, that would not have been a cause of his slipping.

The ramp, as it was at the time of the accident at low tide, was dangerous because of the sharp inclination, the missing cleat and the wet surface. These combined factors were the cause of Dobrovich's accident.

The ramp as it was at the time of the accident did not comply with various building and safety codes. This was particularly true at low tide when the angle of incline became so pronounced. A ramp which exceeds 20° in inclination is dangerous since at that operating range a stair or ladder is called for. The parties dispute whether those codes were applicable to a ramp leading to marine facilities. The Court does not attempt to resolve that dispute but finds that, under the conditions then present (i.e. sharp incline at low tide, missing cleat, wet wood), the ramp constituted a dangerous passageway.

Aquaculture conducts its business through a Board of Trustees which included Clarence ("Wendell") Corey who also was the director of operations and an experienced marine operator. He had previously captained the JOHN E. PFRIEM. He inspected the property prior to the start of the 1995 season, including the boarding arrangements such as the ramp, since he knew it would be used by Aquaculture employees. No complaints were made by Corey, Aquaculture or anyone else concerning the conditions of the ramp. Dobrovich's duties as captain of the vessel were limited to the vessel itself and did not include anything to do with the ramp or other aspects of ingress/egress.

Following the accident Dobrovich called to Al Hotchkiss, who was nearby, who in turn called for help. Dobrovich was taken by ambulance to the Milford Hospital where he was evaluated and found to have a severely broken ankle. Surgery was necessary in order to set it and two plates and a large number of pins had to be inserted to correct the break. (Further surgery may be conducted to remove some of the hardware.) Dobrovich was out of work for a year during which time he received maintenance and cure from the Aquaculture Foundation.

In 1996 Aquaculture filed a petition for exoneration from or limitation of liability pursuant to 46 U.S.C.App. § 183(b). Dobrovich countered with the Jones Act claim. He also filed suit against Al Hotchkiss and Leslie Hamel. The suit against Hotchkiss was dismissed by the Court which determined that the ramp was an extension of the land and not a part of the ship so that there was no Federal admiralty jurisdiction. The case against Hamel, as to whom there was diversity jurisdiction, was settled immediately prior to a scheduled jury trial. Aquaculture's petition for limitation was denied for the same reason that the Hotchkiss case was dismissed. This Jones Act trial then proceeded non-jury.

### CONCLUSIONS OF LAW

Aquaculture takes the position that even if the ramp is found to be dangerous at the

time of the accident, it has no liability since the ramp was connected to land and not owned by it. In support of its position Aquaculture relies on a number of old cases.[1] For example, Aquaculture argues that a vessel's owner's duty to a seaman ends at the land end of the gangway/dock and that it has only a duty to provide a reasonably safe means of ingress/egress. The principal authority cited is *Wheeler v. West India S.S. Co.*, 205 F.2d 354 (2d Cir.1953). That decision is a one-sentence per curiam[2] affirming the decision of the District Court below. When we look at the District Court decision we find that it does not support Aquaculture's position. The defendant's vessel was docked in a foreign country at the end of a viaduct which extended about a mile into the sea. An assistant engineer on the vessel went on shore leave over the viaduct while it was still light and there was a wide roadway and railroad tracks on the viaduct. Walkways along both sides of the viaduct were roped off because of bomb damage sustained during the war and there were no lighting facilities. At about two o'clock in the morning the assistant engineer started to walk over the viaduct to return to the vessel. He was struck by a tender attached to a locomotive on the railroad tracks. The District Court found that it was only the negligent operation of the locomotive upon the viaduct in the night time which gave rise to plaintiff's injuries and there was no duty on behalf of the ship owner which could have prevented the negligent operation of the locomotive by a third party. The Court went on to hold that the defendant was not under an absolute duty to provide the plaintiff with a safe means of going to shore and returning to his ship but was duty bound to provide a reasonably safe means of immediate access to the vessel (citing *inter alia Standard*

*Oil Co. v. Robins Dry Dock & Repair Co.*, 32 F.2d 182 (2d Cir.1929)). The Court also noted that shipowners have generally not been held liable for unsafe conditions in places beyond the gangway not under their control when the seaman is there for his own purposes and not in the performance of his duties. Here the plaintiff was in the performance of his duties.

Aquaculture also relies upon the concept that the vessel owner must have notice of the dangerous condition to be held liable citing, *inter alia, Marceau v. Great Lakes*, 146 F.2d 416 (2d Cir.1945). In that case a cook who had gone ashore for personal business and had been ordered to return to provide night lunch, slipped on the dock while approaching the ship's ladder which ran from the dock to the deck. In its decision (per Circuit Justice Augustus N. Hand) the Court held, at 419, that:

> The plaintiff accordingly made out a *prima facie* case by furnishing evidence of a slippery and ill lighted place on the dock which he had to transverse in order to ascend the ladder upon returning to work. We think that it was for the defendant to show that it had no opportunity to ascertain conditions before the accident occurred and it made no attempt to make such a showing.

The Supreme Court in *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 and *Ferguson v. Moore–McCormack Lines*, 352 U.S. 521, 77 S.Ct. 459, 1 L.Ed.2d 515 (1957) made it clear that where the evidence leads the fact finder to the conclusion that the employer's negligence played any part, even the slightest, in producing the injury for which damages are sought, the employer is liable under the FELA and the Jones Act.

■ The Jones Act intended to expand the protection of seamen beyond that pro-

---

1. In the middle of this century various decisions from the Supreme Court enlarged the scope of the Jones Act in providing relief to injured seamen. *See e.g. Ferguson v. Moore–McCormack Lines*, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957).

2. There is a separate paragraph on an appellate issue concerning a motion to amend which is not relevant here.

vided under the admiralty concept of unseaworthy vessels. *Socony–Vacuum Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265 (1939). The Jones Act, 46 U.S.C.App. § 688 applies the same standards as the Federal Employer Liability Act, 45 U.S.C. § 51 et seq. *Shenker v. Baltimore & Ohio Railroad Co.*, 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963). Numerous cases have found railroads liable under the FELA for off premises accidents over which premises the railroad has no control. *See e.g. Daughenbaugh v. Bethlehem Steel*, 891 F.2d 1199 (6th Cir. 1989) and *Carter v. Union Railroad*, 438 F.2d 208, 210–211 (3d Cir.1971).

Many Jones Act cases have resulted in the same approach to liability. For example, in *Hudson Waterways Corp. v. Coastal Marine Service, Inc.*, 436 F.Supp. 597 (E.D.Texas 1977) the Court noted at 599–600:

> The evidence in the case shows that the ramp on which Mr. Behm fell had mud on it and was slippery. The evidence further shows that there were no cleats or hand rails on the ramp to assist a person ascending or descending the ramp.

The Court then held at 603 that:

> a ship is liable for its negligence in failing to provide a safe means for its seamen to get from ship to shore, and the fact that the injury did occur aboard ship does not prevent a recovery under the Jones Act by a seaman. *Magnolia Towing v. Pace*, 378 F.2d 12 (5th Cir. 1967); *Vincent v. Harvey Well Service*, 441 F.2d 146 (5th Cir.1971); *Superior Oil Company v. Trahan*, 322 F.2d 234 (5th Cir.1963).

As in this case, the seaman fell from a ramp leading to the shore from a floating dock to which the ship was moored.

Similarly in *Salamon v. Motor Vessel Poling Bros. No. 11, Inc.*, 751 F.Supp. 343 (E.D.N.Y.1990) a cook who was shopping for ship's groceries and had proceeded across a dock for about 300 feet and started to climb the only exit from the dock (a stairway) slipped and injured himself. The Court, applying the rationale of *Shenker, supra*, found that since the stairway was the sole means by which the plaintiff could reach the shore to fulfill his responsibilities there was a factual issue as to whether the ship owner was negligent in failing to take reasonable precautions to protect the plaintiff. *See also Superior Oil Co. v. Trahan*, 322 F.2d 234 (5th Cir. 1963) which held that the ship owner has a duty to provide a reasonably safe means of boarding and departing the vessel.

As in the *Salamon* case *supra*, we do not hold that the vessel owner is responsible for inspecting the seaman's entire route once he leaves the vessel. But where the only means of ingress/egress is only a hundred feet from the vessel, it raises the question of whether the ship owner was negligent in failing to take reasonable precautions to protect the plaintiff.

█ It is clear that the employer can be held liable if it was negligent and that its negligence was a cause, however slight, of his injuries. *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir.1993). Moreover, "the quantum of evidence necessary to support a finding of Jones Act negligence is less than that required for common law negligence … and even the slightest negligence is sufficient to sustain a finding of liability" *Id.* at 218. However, the employer is liable under the Jones Act only if it knew or should have known of the dangerous condition if that is what caused the accident. *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658 (9th Cir.1997). In that regard this is a close case.

█ Aquaculture's director inspected the ramp shortly before the accident. We do not know the state of the tide at that time (at high tide the ramp is almost horizontal). However, he had been the master of the vessel in previous years and surely used the ramp under low tide conditions when the incline was sharp. We cannot tell whether when he inspected the ramp the cleat was missing. Indeed, the person

responsible for maintaining the condition of the ramp (Al Hotchkiss) maintains that the cleat was *never* missing. However, photographs taken immediately after the accident show that a cleat *was* missing. Since the ramp did not have non-skid covering and wet wood can be slippery, that cleat was the only protection when the ramp was sharply inclined. We conclude therefore that Aquaculture knew or, in the reasonable exercise of care should have known, that the ramp was dangerous at low tide particularly when wet.

While there was a suggestion that Dobrovich's holding a cup in one hand could have contributed to the accident, there was inadequate proof of the fact that he was holding a cup and, moreover, in light of the width of the ramp, one railing was all he could hold at a given time. There was no proof that he was not holding that rail merely that the shape of the handrail (over which he had no control) was such that it was difficult to grasp.

Consequently we find that Aquaculture has been guilty of sufficient negligence to warrant a verdict for Dobrovich and that its liability need not be diminished by any finding of contributory negligence. The parties are directed to offer their proof on damages.